STATE OF CONNECTICUT *v.* KEVIN CANTY
(14463)

PETERS, C. J., COVELLO, BORDEN, BERDON and F.X. HENNESSY, Js.

Argued April 2—decision released August 12, 1992

*Neal Cone,* assistant public defender, with whom, on the brief, was *G. Douglas Nash,* public defender, for the appellant (defendant).

*James A. Killen,* assistant state's attorney, with whom, on the brief, were *Eugene J. Callahan,* state's attorney, and *Philip D'Eramo,* assistant state's attorney, for the appellee (state).

COVELLO, J. The defendant, Kevin Canty, is appealing his conviction of the sale of narcotics, as an accessory, by a person who is not drug-dependent, in violation of General Statutes §§ 53a-8 and 21a-278 (b).[1] Following a jury trial and a guilty verdict, the trial court rendered judgment sentencing the defendant to ten years imprisonment, suspended after seven years followed by a three year conditional discharge. The issues

---

[1] General Statutes § 53a-8 provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

General Statutes § 21a-278 (b) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marihuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years or, (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution."

on appeal are whether the trial court: (1) improperly allowed the state to cross-examine the defendant concerning his failure to disclose certain exculpatory information before trial; (2) abused its discretion in allowing the state to present rebuttal evidence from a police officer; (3) unfairly emphasized the state's evidence in its charge to the jury; (4) abused its discretion in refusing to order the removal of handcuffs from a defense witness; and (5) improperly refused to declare a mistrial as the result of the state's references to the absence of two witnesses referred to during the defendant's case-in-chief. We affirm the judgment.

The jury might reasonably have found the following facts. On April 28, 1989, Officer Ashley Gonzalez of the Norwalk police department was working as an undercover agent in the Mulvoy Street area of South Norwalk. An "arrest team" consisting of Officer Kenneth Riley, Officer Carlos Cotto and Detective Ronald Pine was also in the area to support Gonzalez. According to their plan, Gonzalez, who was wearing a hidden body microphone, would attempt to buy narcotics while the arrest team monitored the transaction. If Gonzalez were successful, the arrest team would respond by making arrests based upon the information provided via the microphone.

At approximately 2:45 p.m., Gonzalez pulled his unmarked car up to the curb in front of a group of males gathered on the street. Gonzalez gestured to one of the men, later identified as Hugh Pollard, in a manner that indicated that Gonzalez was interested in purchasing drugs. After Pollard approached the car and opened the door, Gonzalez asked him for some "P," which is a street term for heroin. Pollard told Gonzalez to wait, walked down the sidewalk, and approached a black male, later identified as the defendant. Gonzalez then saw the defendant hand Pollard a glassine envelope

after a brief conversation between the two. Gonzalez later testified that he had observed this exchange from a distance of approximately fifteen feet.

After this exchange, Pollard, still clenching his fist around the glassine envelope, returned to Gonzalez' car, closed the door, and told Gonzalez to "drive around" to avoid police surveillance. As Gonzalez drove around the block, Pollard handed him the envelope and, in exchange, Gonzalez gave Pollard $20. Gonzalez then returned Pollard to their original location and radioed descriptions of Pollard and the defendant to the arrest team. Gonzalez then drove to police headquarters where, upon performing a field test on the substance in the envelope, he determined that it was heroin.

A few minutes after Gonzalez had returned Pollard to the Mulvoy Street area, the arrest team drove to the area and, based on Gonzalez' descriptions, identified Pollard and the defendant standing on Mulvoy Street. Pine got out of the vehicle, approached Pollard and placed him under arrest. As Riley began walking toward the defendant, the defendant began to run. Riley and Cotto both chased the defendant, during which time Riley observed him drop a brown object. This object was later recovered and found to be a bag containing twelve vials of crack cocaine. The officers pursued the defendant into a housing complex where he was subsequently apprehended. Cotto later testified that the defendant, upon his arrest, "just kept reiterating that he didn't have anything, he didn't have anything." The police recovered the defendant's red jacket that he had been carrying as he ran and found, inside one of the pockets, a small notebook with his name on the cover. Inside the notebook there were entries for parties, phone numbers, and what appeared to be drug transactions, e.g., "Stevie, two bags" and "5 [grams]."

The state tried the defendant as an accessory to the heroin sale by Pollard to Gonzalez. At trial, the defendant took the stand and testified that he had never given Pollard a glassine envelope, but had been simply shaking hands with him after making an agreement to wallpaper several rooms in Pollard's mother's house. The defendant further testified that he had not been the only person to run when the arrest team arrived and he had done so because he had not wanted his father to know that he had been in the Mulvoy Street area. The defendant also stated that he had not dropped a brown paper bag during the chase prior to his arrest, but that he had seen someone, later identified as Curtis Langley (Gumby), drop it when Gumby had run away.[2] Pollard also testified and corroborated the claim that he and the defendant had been merely shaking hands and that he, Pollard, had acted alone in the sale to Gonzalez. Willie Massey, a bystander at the time of the arrest, corroborated the defendant's testimony that it was Gumby, not the defendant, who had dropped the brown bag as the group scattered.

## I

Following direct examination, the state's attorney asked the defendant why he had waited until trial to disclose that it was Gumby who had dropped the bag. The defendant responded that he had told his counsel from the outset that he did not have the bag, but he had wanted to find out Gumby's real name before dis-

---

[2] The defendant testified on direct examination:

"[The Defendant:] Two people ran by me okay? Now somebody hollered stop and I seen when they threw the bag down.

"[Defense Counsel:] Who threw the bag down?

"A. The guy's name is [Curtis] Langley.

"Q. Is that Gumby?

"A. That's what they call him on the street.

"Q. That's his nickname?

"A. Yeah."

closing it to his attorney.[3] During recross-examination, the trial court asked the defendant why he had not disclosed this information to the authorities.[4] In his response, the defendant denied having remained silent and testified: "I told Officer Cotto that I did not throw the drugs down." This exchange constituted the sole reference during trial to the defendant's alleged nondisclosure. There was no objection to the line of ques-

[3] On cross-examination, the defendant responded as follows:

"[The Defendant:] Why did I wait till today, I never had the chance to.

"[State's Attorney:] You never had the chance to tell [your lawyer]?

"A. To get what out?

"Q. That some other guy dropped the drugs?

"A. Wait a minute, wait a minute. I told him from the minute I was arrested that I didn't have no brown bag.

"Q. Did you tell him who did?

"A. I did not know the person's name at the time, but I knew who did it.

"Q. But you knew the nickname, though. You knew the nickname, Gumby?

"A. Yeah, but I wanted to try and find out his real name."

On redirect examination, the following occurred:

"[Defense Counsel:] [The prosecutor] was asking you whether you told me from the beginning whether it was Gumby that had thrown down the drugs, is that it?

"[Defendant:] No, but I told you that it wasn't mine. I definitely knew I didn't throw them down.

"Q. Okay, did you tell me who it was that threw them down?

"A. No."

[4] On recross-examination, the state's attorney asked the defendant: "Didn't you think it was important to tell your lawyer so he could investigate who this Gumby was and you never told him; you just told your lawyer that you didn't have anything to do with drugs?" At this point, the defendant objected on the grounds that the question intruded upon the attorney-client privilege. The trial court overruled the objection ruling that the question did not ask what the defendant had said to his attorney but rather why he had not taken a certain course of action. The defendant thereafter explained that he had not informed his attorney because he had not known Gumby's real name at the time.

The trial court then stated: "One moment, please. Something else just occurred to me here. It's not just why didn't you tell your attorney. The real question is why didn't you tell the authorities—same question—and then we don't get at all to this question of violating the attorney-client privilege; but, in either event, you did neither, is that correct?"

tioning until after completion of the redirect examination that involved the same subject. There was no motion for a mistrial. The defendant now claims that the state's and the trial court's questions about his failure to tell his attorney and the authorities about Gumby constituted a violation of the due process clause of the fourteenth amendment pursuant to the holding in *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).

In *Doyle,* the United States Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda*[5] warnings, violated the Due Process Clause of the Fourteenth Amendment." Id., 619. The *Miranda* tenets "require that a person taken into custody be advised immediately that he has the right to remain silent, [and] that anything he says may be used against him . . . . Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." Id., 617. "[Such] silence . . . is 'insolubly ambiguous' because it may constitute a reliance upon those rights rather than a tacit admission that the accused has an insufficient defense or explanation for his conduct." *State* v. *Talton,* 197 Conn. 280, 295, 497 A.2d 35 (1985).

*Doyle* applies to bar comment on the defendant's silence in this case even if he was never subjected to a custodial interrogation following his receipt of *Miranda* warnings.[6] *State* v. *Plourde,* 208 Conn. 455, 466, 545 A.2d 1071 (1988), cert. denied, 488 U.S. 1034,

---

[5] *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[6] In response to the defendant's request, we authorized augmentation of the record to include transcripts of the trial court's warning to the defendant of his *Miranda* rights at the time of his arraignment.

109 S. Ct. 847, 102 L. Ed. 2d 979 (1989). A *Doyle* violation may, however, be harmless beyond a reasonable doubt and we conclude that such harmlessness has been established in the circumstances of this case.

In *State* v. *Silano,* 204 Conn. 769, 529 A.2d 1283 (1987), the prosecutor asked the defendant why, after a custodial interrogation had ceased, he did not return to the police to correct allegedly false statements he had made during that interrogation. In addition, the prosecutor commented during closing argument about the defendant's failure to return to the police. We concluded that the error was harmless beyond a reasonable doubt.

"A *Doyle* violation may, in a particular case, be so insignificant that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible question or comment upon a defendant's silence following a *Miranda* warning. Under such circumstances, the state's use of a defendant's postarrest silence does not constitute reversible error. In limited instances, ' "[w]hen there is but a single reference at trial to the fact of [the] defendant's silence, the reference is neither repeated nor linked with [the] defendant's exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to [the] defendant's silence constitutes harmless error." *Chapman* v. *United States,* 547 F.2d 1240, 1250 (5th Cir.), cert. denied, 431 U.S. 908, 97 S. Ct. 1705, 52 L. Ed. 2d 393 (1977); *Leake* v. *Cox,* 432 F.2d 982, 984 (4th Cir. 1970). The [error] has similarly been [found to be harmless] where a prosecutor does not focus upon or highlight the defendant's silence in his cross-examination and closing remarks and where the prosecutor's comments do not strike at the "jugular" of the defendant's story. *United States* v. *Davis,* [546 F.2d 583, 594 (5th Cir.), cert. denied, 432 U.S. 906, 97 S. Ct. 1701, 52 L.

Ed. 2d 391 (1977)]; see *United States* v. *Harp,* 536 F.2d 601, 603 (5th Cir. 1976).' *State* v. *Zeko,* 177 Conn. 545, 555, 418 A.2d 917 (1979) . . . ." *State* v. *Silano,* supra, 781–82.

A number of factors lead us to the conclusion that the error in this case was harmless beyond a reasonable doubt. First, the state charged the defendant as an accessory to the sale of narcotics based upon Gonzalez' purchase of heroin from Pollard, a completely independent transaction that took place several minutes before the events involving the dropped bag. The dropped bag incident did not establish directly any element of the crime with which the defendant was charged. Second, the colloquy involving the failure to disclose Gumby to the authorities occurred only at one point during trial and was not mentioned thereafter by either the state's attorney or the trial court. The matter was not argued to the jury. Third, in response to questioning, the defendant denied having remained silent about the bag, thereby diluting, through his own testimony, the insoluble ambiguity that an accused's silence following *Miranda* warnings is supposed to generate. Fourth, trial counsel's failure to object to the question concerning Gumby until after redirect examination, in which counsel elected to pursue the same subject, indicates that he did not consider this portion of the cross-examination to have prejudiced the defendant. Moreover, there was no motion for a mistrial. Id., 782.

Finally, the questioning did not strike at the "jugular" of the accused's defense. The defendant corroborated through his own testimony and that of his witnesses, Pollard and Massey, exactly those events to which Gonzalez testified including the sale of the heroin. The defendant's version differed only in his claim that he had not been involved because he had not given the heroin to Pollard but had been merely shak-

ing hands with him as a means of binding the defendant's commitment to assist in a wallpapering project. It is arguable that the defendant's credibility on this point was absolutely critical to his defense, and to the extent that the Gumby matter impacted upon his credibility, the line of questioning did strike at the "jugular" of his defense. The defendant's testimony, however, did not constitute the sole basis for the claims he was making. Rather his testimony was only one piece of a mosaic that included the corroborating testimony of both Pollard and Massey. Thus, for the jurors to have found the defendant guilty beyond a reasonable doubt, as the trial court instructed, it was necessary for them to reject, as not being credible, not only the defendant's version of what happened but also the version as described by both Massey and Pollard.

In this connection, we note that the state's evidence, although not uncontroverted, was certainly very strong. Gonzalez observed the exchange between the defendant and Pollard from a distance of only fifteen feet. Pollard returned directly to the police vehicle while holding the glassine envelope that Gonzalez saw the defendant hand to him, and the notebook recovered from the defendant's jacket indicated the defendant's involvement in drug transactions. Furthermore, the defendant does not claim mistaken identity. He admitted "shaking hands" with Pollard in the transaction in question.

It is also arguable that a reversal is warranted because in this case it was the court, rather than the prosecutor, that elicited the fact of the defendant's failure to inform the authorities regarding Gumby. It is true that, in other contexts, we have placed special emphasis upon improper questions posed by the trial court because of their likely impact on the jury. See, e.g., *State* v. *Fernandez,* 198 Conn. 1, 501 A.2d 1195 (1985). Nonetheless, because this one improper ques-

tion by the court was isolated; compare *State* v. *Fernandez,* supra (repeated questions by trial court to defendant's witness); because the question did not focus solely on the defendant's failure to inform the authorities, and because it was never traded on or emphasized by either the court or the state, this factor alone is insufficient to raise a reasonable doubt as to its harmlessness.

"The instant case does not present a prosecutorial focus—by repetitive questioning, on a defendant's silence, as in *Doyle* v. *Ohio,* supra. Nor can we say that the comments, in the context of . . . the cross-examination of the defendant . . . so 'highlighted' the defendant's silence as to constitute prejudicial error . . . . Similarly, we cannot say that the comments 'struck at the jugular' of the defendant's defense, as the context of the prosecution's comments reveals." *State* v. *Zeko,* supra, 555–56.

"The cases wherein the error has been found to be prejudicial disclose repetitive references to the defendant's silence, reemphasis of the fact on closing argument, and extensive, strongly-worded argument suggesting a connection between the defendant's silence and his guilt. See, e.g., *Minor* v. *Black,* 527 F.2d 1 (6th Cir. 1975); *Moye* v. *Paderick,* 526 F.2d 589 (4th Cir. 1975); *Fowle* v. *United States,* 410 F.2d 48, 49 n.1 (9th Cir. 1969); cf. *United States* v. *Edwards,* 576 F.2d 1152, 1155 (5th Cir. 1978)." *State* v. *Zeko,* supra, 557. After viewing the challenged questions in the totality of the circumstances, we conclude that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without them.

## II

The defendant next claims that the trial court abused its discretion in allowing Gonzalez to offer rebuttal testimony that was, in essence, merely cumulative of his

prior testimony. The specific testimony that the defendant emphasizes concerned Gonzalez' ability to see the transaction between Pollard and the defendant and their relative positions after Pollard first left Gonzalez' car. Gonzalez testified that he had been able to see the side of Pollard's face while Pollard had been talking with the defendant and that he had been able to see clearly the defendant hand the glassine envelope to Pollard. In order to clarify his testimony, Gonzalez physically demonstrated his position relative to Pollard and the defendant during the exchange.

During the defendant's case-in-chief, defense counsel questioned Pollard about his interaction with the defendant after speaking with Gonzalez. When Pollard was asked if he had had his back to the car after having talked with Gonzalez, he responded: "Yeah. No, like this." Pollard then also proceeded to give a physical demonstration of his position relative to Gonzalez and the defendant.

After the defense rested, the state's attorney recalled Gonzalez and asked whether Pollard's statement that he had had his back to Gonzalez had been accurate or whether it was more of a "side to side" view. At this point, defense counsel objected on the grounds that the proposed testimony was not rebuttal but simply cumulative of the witness' earlier testimony. The trial court overruled the objection. Gonzalez then explained that Pollard's back had not been facing him because he had clearly been able to see the transaction between the two.

"Rebuttal evidence is usually 'confined to testimony which is directed at refuting the evidence given by the defendant'; *State* v. *Addazio*, 169 Conn. 416, 427, 363 A.2d 153 (1975); or is 'in general contradiction of the testimony given by the defendant . . . .' *State* v. *Fine*, 159 Conn. 296, 301, 268 A.2d 649 (1970). 'The admis-

sion of rebuttal evidence is ordinarily within the sound discretion of the trial court. See, e.g., *State* v. *Nims,* 180 Conn. 589, 599, 430 A.2d 1306 (1980); *State* v. *Palozie,* 165 Conn. 288, 299, 334 A.2d 468 (1973); *State* v. *Leopold,* 110 Conn. 55, 67, 147 A.2d 118 (1929).' *State* v. *Lisella,* 187 Conn. 335, 337, 445 A.2d 922 (1982)." *State* v. *Simino,* 200 Conn. 113, 123, 509 A.2d 1039 (1986).

Gonzalez' rebuttal testimony tended to refute the inference raised by Pollard's testimony that Pollard's back had been facing Gonzalez and that Gonzalez, therefore, could not have seen any alleged transaction between Pollard and the defendant. While Gonzalez had specifically denied during cross-examination that Pollard had had his back to him, the claim that this might have been the case had never been made until Pollard testified. Under these circumstances, it was well within the discretion of the trial court to allow the state to present Gonzalez' testimony in rebuttal.

## III

The defendant next claims that the trial court improperly charged the jury by unfairly marshalling the evidence so as to favor the state while ignoring the evidence favorable to the defendant and that, therefore, he had been deprived of the fundamental constitutional right to a fair trial. "The purpose of marshalling the evidence, a more elaborate manner of judicial commentary, is 'to provide a fair summary of the evidence, and nothing more . . . .' " (Citation omitted.) *State* v. *Hernandez,* 218 Conn. 458, 462, 590 A.2d 112 (1991). " 'The trial court may, at its discretion, call the attention of the jury to the evidence, or lack of evidence, bearing upon any point in issue and may comment upon the weight of the evidence so long as it does not direct or advise the jury how to decide the matter.' *State* v. *Mullings,* 166 Conn. 268, 274, 348 A.2d 645 (1974)."

*State* v. *Shannon,* 212 Conn. 387, 408, 563 A.2d 646, cert. denied, 493 U.S. 980, 110 S. Ct. 510, 107 L. Ed. 2d 512 (1989); *State* v. *Duffy,* 57 Conn. 525, 529, 18 A. 791 (1889).

The defendant claims that the trial court mentioned most of the state's testimonial and physical evidence while "not the slightest allusion was made to the defendant's theory of defense." This is simply not true. The defendant's theory of defense was that he was present at the scene but that he was merely a bystander, that he had no knowledge of what was occurring, and that he was not a participant in the crime. With respect to this specific claim the trial court stated in its charge: "Now evidence of mere presence, whether as on the scene, in the neighborhood, on the street, whether as an inactive companion, as someone who is passive and just acquiesces in what he saw, or the doing of innocent acts which in fact aid in the commission of a crime, is insufficient to find the defendant guilty as an accessory under the statute." The trial court further charged: "A person must have knowledge that he possessed or had under his control the heroin, the narcotic substance. If he had no knowledge of it whatsoever, he would not have either possession or control and of course he would not be guilty under those circumstances." Finally, the trial court stated: "Now I would like to get to the presence of this defendant on the street and in the neighborhood in question on that particular date and time. As I've told you, the mere presence of the defendant in the vicinity where the transaction is alleged to have occurred is insufficient in and of itself to support a finding of constructive possession." We find that the defendant's claim that trial court's charge did not make the slightest allusion to his theory of defense, is simply not borne out by what the trial court in fact told the jury.

Further, the trial court told the jury that it must independently weigh all the evidence for itself; that the defendant was entitled to a fair and careful consideration of his testimony; that the defendant's testimony should not be disregarded merely because he had a prior felony conviction; and that, although the defendant's flight from the scene tended to evidence a consciousness of guilt, it should consider the defendant's explanation for fleeing, i.e., that he had not done anything wrong by discussing a wallpapering job with Pollard, but ran away anyway because he had been afraid and because his father had told him to stay away from that area of town.

We conclude that the trial court did not unfairly emphasize the state's evidence in its charge so as to deprive the defendant of a fair trial.

## IV

The defendant next claims that the trial court abused its discretion in refusing the defendant's request to have the handcuffs removed from a defense witness, Willie Massey. The defendant argues that the trial court abdicated its responsibility to rule on the defendant's request to have the handcuffs removed by completely deferring to the courtroom sheriff's opinion on the matter. We disagree.

At the time of the defendant's trial, Massey was in custody awaiting trial for murder. Outside the presence of the jury, Massey was brought into the courtroom wearing handcuffs and leg irons. The defendant requested that Massey's handcuffs be removed prior to the return of the jury noting that there were four security guards present and that there had been no showing that he was a dangerous person. In response, the prosecutor replied: "They don't know what they're dealing with." At this point, the trial court told the sheriff that there had been a request to remove Massey's

handcuffs. The sheriff responded that the security force had strict rules forbidding the removal of handcuffs in cases such as Massey's and that he was definitely a security risk. The trial court thereupon found that Massey was a security risk and stated that it would not jeopardize the safety of the people in the courtroom by ordering removal of the handcuffs. The trial court then granted the defendant's requests that Massey be seated on the witness stand prior to the return of the jury and that the jury be excused before Massey left the stand. There is no clear indication in the record whether the jurors were aware of Massey's handcuffs as he sat on the witness stand.

"[A] defendant's right to appear before the jury unfettered is not absolute. *State* v. *Woolcock*, [201 Conn. 605, 613, 518 A.2d 1377 (1986)]. A trial court may employ a 'reasonable means of restraint' upon a defendant if, exercising its broad discretion in such matters, the court finds that restraints are 'reasonably necessary' under the circumstances. Practice Book § 892; see *Sekou* v. *Warden*, [216 Conn. 678, 692, 583 A.2d 1277 (1990)]. In reviewing a shackling claim, our task is to determine whether the court's decision to employ restraints constituted a clear abuse of discretion. . . . In view of the fact that the law enforcement personnel at our courthouses are responsible for and possess superior experience in matters of courtroom security, it is practicable for a court to ' "rely heavily" ' upon the advice of such personnel in determining whether a criminal defendant should be restrained. *Sekou* v. *Warden*, supra, 693; see *State* v. *Williams*, [195 Conn. 1, 9, 485 A.2d 570 (1985)]; see also *United States* v. *Samuel*, 431 F.2d 610, 615 (4th Cir. 1970), cert. denied, 401 U.S. 946, 91 S. Ct. 964, 28 L. Ed. 2d 229 (1971). A court may also consider other information not in evidence, including official records, information supplied by correctional officers and attorneys, and 'facts gen-

erally known within the limits of its jurisdiction.' *State*
v. *Woolcock,* supra, 616; see *State* v. *Williams,* supra."
*State* v. *Tweedy,* 219 Conn. 489, 505–507, 594 A.2d 906
(1991).

We have also held, however, that "[a] record in some
fashion disclosing the justification for using restraints
. . . is essential to meaningful appellate review of a
shackling claim." Id., 506. The bald, unsupported opin-
ions of the prosecutor and the sheriff were the sole basis
for the trial court's order that Massey remain bound
hand and foot during his testimony before the jury.
When the trial court indicated to the sheriff that
defense counsel had requested that Massey's handcuffs
be removed, the sheriff replied: "No, sir. We have strict
rules that this particular case, cases such as this, that
we do not." The trial court never asked the sheriff to
explain what the set of "cases such as this" included
and what it was about Massey that made him belong
to that set of cases. Because the trial court never
elicited the basis of the sheriff's opinion, "the court not
only denied the defendant a meaningful opportunity to
respond to that information, but also rendered the rec-
ord inadequate for our review of its decision to restrain
[the witness]. The record, moreover, does not other-
wise evince the requisite reasonable necessity for
restraints." Id., 507.

"The negative connotations of restraints, neverthe-
less, are without significance unless the fact of the
restraints comes to the attention of the jury." Id., 508.
The defendant failed to show that the jury ever saw
the handcuffs and that he was thereby prejudiced by
the ruling. Id., 508–509; see *State* v. *Woolcock,* supra,
617 n.5. Any impropriety was, therefore, harmless.

V

The defendant next claims that the trial court improp-
erly refused to declare a mistrial as a result of the

state's attorney's reference in closing argument to the absence at trial of two defense witnesses, Alice Brickhouse and Gumby. The state's attorney neither sought nor obtained an advance ruling from the trial court prior to making the remarks concerning the missing witnesses, contrary to the holding in *State* v. *Daniels,* 180 Conn. 101, 429 A.2d 813 (1980).[7]

An examination of the record discloses that the defendant testified that an entry in the notebook found in his jacket, "Stevie, two bags," had referred to someone who had given the defendant two bags of marihuana to pay a debt. The defendant further explained that he had thereafter given the marihuana to a woman named Alice Brickhouse. During closing argument, the state's attorney recounted the defendant's testimony regarding the marihuana and then remarked: "I didn't see that lady here testifying about [how] she received the bags of marihuana." With reference to the dropped

---

[7] In *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598 (1960), we stated: "The failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause. . . . There are two requirements for the operation of the rule: The witness must be available, and he must be a witness whom the party would naturally produce." (Citations omitted; internal quotation marks omitted.)

In *State* v. *Daniels,* 180 Conn. 101, 113, 429 A.2d 813 (1980), we stated that, when "counsel for either the state or the defendant intends to argue to the jury that an unfavorable inference be drawn from the absence of a witness at trial, an advance ruling from the trial court should be sought and obtained." "The purpose of such an advance ruling is to allow the trial court to evaluate whether a party is entitled to the unfavorable inference which it seeks to have the jury draw under the test established in *Secondino* v. *New Haven Gas Co.,* [supra]. At the time the ruling is requested, 'the trial court should determine whether the defendant's fifth amendment right not to testify would be violated by the proposed argument and whether there is sufficient evidence for the jury to find that the absent witness is (1) available to the party against whom the inference is sought to operate and (2) one whom that party would naturally be expected to produce.' *State* v. *Daniels,* supra, 113–14." *State v. Gonzalez,* 197 Conn. 677, 680–81, 500 A.2d 1330 (1985).

bag of cocaine, the prosecutor said: "I have not seen Mr. Gumby or heard from Mr. Gumby in this case." "The effect of those remarks was to suggest to the jury that it might draw the inference that any testimony by the missing witnesses would have been unfavorable to the defendant." *State* v. *Gonzalez,* 197 Conn. 677, 680, 500 A.2d 1330 (1985).

A trial court has broad discretion in ruling on motions for a mistrial. *State* v. *Weinberg,* 215 Conn. 231, 249, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990). "A motion for a mistrial is a drastic remedy, granted only when some event has occurred that is so prejudicial it precludes a fair trial. *State* v. *Marra,* 215 Conn. 716, 732, 579 A.2d 9 (1990)." *State* v. *Willis,* 24 Conn. App. 678, 684, 591 A.2d 445 (1991), aff'd, 221 Conn. 518, 605 A.2d 1359 (1992). The ultimate question on such motions is whether there was "substantial and irreparable prejudice to the defendant's case." Practice Book § 887. Otherwise stated, the question is "whether the claimed erroneous action of the [trial] court would have been likely to affect the result." *State* v. *McClain,* 171 Conn. 293, 300, 370 A.2d 928 (1976). "Due process seeks to assure a defendant a fair trial, not a perfect one." *State* v. *Kurvin,* 186 Conn. 555, 565, 442 A.2d 1327 (1982). We conclude that the prosecutor's references to the missing witnesses did not cause the "substantial and irreparable prejudice" necessary to compel the drastic remedy of a mistrial, and that under the circumstances of this case, any error was harmless. "In doing so we have viewed the state's attorney's comments in the context of the entire trial and the instructions that guided the jury's deliberations." *State* v. *Daniels,* supra, 112.

The testimony of Brickhouse, if offered and favorable to the defendant, would only have corroborated the defendant's testimony concerning a single entry

in his notebook. The matter of the meaning of this single entry was only marginally related to the offense charged and shed little light on the defendant's claim that he was simply a bystander during a crime that his own witness, Pollard, agreed had taken place in the defendant's presence. Similarly, Gumby's testimony that it was he who had dropped the bag would have been cumulative of Massey's testimony to the same effect.

The defendant's failure to propose the alternative of a curative instruction further undercuts his claim that the trial court abused its discretion in rejecting a mistrial. See *State* v. *Lucci*, 25 Conn. App. 334, 348, 595 A.2d 361, cert. denied, 220 Conn. 913, 597 A.2d 336 (1991). The defendant's claim that the trial court would have denied a request for a curative instruction is pure conjecture. He cannot succeed in showing harmful error by speculating that an alternative he failed to propose might have been rejected.

The judgment is affirmed.

In this opinion PETERS, C. J., BORDEN and F.X. HENNESSY, Js., concurred.

BERDON, J., dissenting in part. I disagree with part I of the majority opinion. The majority concedes that the trial court violated the holding of *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), when it permitted the state to impeach the defendant by calling attention to his silence after receiving the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and when that court later itself attacked the defendant's credibility in the same way. The majority claims, however, that even though the defendant's credibility was crucial to his defense, the error was harmless. This result is reached only by ignoring the undisputed facts.

The majority asserts that "the colloquy involving the failure to disclose Gumby to the authorities occurred only at one point during trial and was not mentioned thereafter by either the state's attorney or the trial court." Thus, they argue that this case is governed by those authorities that hold that reference to the defendant's silence can be harmless error when "there is but a single reference at trial to the fact of [the] defendant's silence [and] the reference is neither repeated nor linked with the defendant's exculpatory story . . . ." *Chapman* v. *United States,* 547 F.2d 1240, 1250 (5th Cir.), cert. denied, 431 U.S. 908, 97 S. Ct. 1705, 52 L. Ed. 2d 393 (1977); *State* v. *Silano,* 204 Conn. 769, 781, 529 A.2d 1283 (1987).

In fact, however, there were two distinct episodes in which the state or the court referred to the defendant's silence and thereby impeached his credibility. The first reference was made by the state's attorney during cross-examination, and the second was made by the trial court during recross-examination.

During cross-examination, while discussing the defendant's account of how Gumby had dropped the bag, the prosecutor asked, "Why did you wait until today to get this out?" The import of this question was obviously that the defendant should have told the authorities his story before trial and that his failure to do so reflected unfavorably on his credibility. The first *Doyle* violation was complete as soon as the question was asked, and was compounded by the subsequent line of questioning, which focused on the defendant's postarrest silence.[1]

The defendant's testimony on cross-examination soon moved on to other matters, including the defendant's own personal use of illegal drugs and his previous con-

[1] The subsequent line of questioning appears in footnote 3 of the majority opinion.

versations with Willie Massey, who corroborated his testimony. Redirect examination then was conducted by defense counsel, who elicited testimony from the defendant concerning the entries in his notebook, his conversations with his alleged accomplice, Hugh Pollard, and the reason why the defendant had run from the police at the time of his arrest. Defense counsel, obviously concerned about the damage to the defendant's credibility caused by the reference to his postarrest silence, then raised that issue again by asking why the defendant had not told him or the police about Gumby, and elicited testimony that the police had never questioned the defendant. Thereafter, testimony ranged over several other topics.

When recross-examination began, the state's attorney asked the defendant about several unrelated topics before returning to the issue of whom the defendant had or had not told about Gumby. At that point, for the first time, the defense attorney raised the issue of attorney-client privilege. There then followed a lengthy argument between the attorneys, in the presence of the jury, about the scope of that privilege and whether it applied to the defendant's alleged failure to tell his attorney about Gumby. This argument itself further focused the jury's attention on the defendant's silence about Gumby. Thereafter, questioning resumed. In the middle of that questioning, the trial court interrupted and stated: "One moment, please. Something else just occurred to me here. It's not just why didn't you tell your attorney. *The real question is why didn't you tell the authorities*—same question—and then we don't get at all to this question of violating the attorney-client privilege; but, in either event, you did neither, is that correct?" (Emphasis added.)

I do not understand how these two incidents, separated by a long period of time, covering nearly thirty transcript pages, during which testimony was taken on

a number of unrelated topics, can be deemed to have occurred during the same "point" of a trial. Whatever the meaning of the court's new "one point during trial" standard, it is clearly a dramatic departure from the cases on which the court purports to rely, in which there actually, not metaphorically, was "but a single reference at trial to the fact of defendant's silence." Compare *Chapman* v. *United States,* supra, 1249 ("in the case at bar the prosecutor asked one question eliciting the fact of Chapman's silence, and that fact was never alluded to again"); *State* v. *Silano,* supra, 784 ("only a single question by the prosecutor, a nonresponsive repetitive response by the defendant, and an ambiguous passing comment in the state's closing argument"); *State* v. *Zeko,* 177 Conn. 545, 556, 418 A.2d 917 (1979) ("single comment by the prosecution's rebuttal witness that the defendant had not given a statement following arrest, with no attempt then or in closing argument to suggest that the jury draw an implication of guilt from silence").

Moreover, the second *Doyle* violation was particularly egregious because it was the trial court that interrupted the prosecutor's questioning and brought the issue of the defendant's silence with respect to the authorities to the attention of the jury. As the majority acknowledges, we have often noted that comments of the trial court carry special weight with the jury. Taken in context, the trial court's improper question was hardly "isolated," as the majority claims. Nor is it the case that the question "did not focus solely on the defendant's failure to inform the authorities." The defendant's failure to inform the authorities was precisely what the trial court's question concerned.

The majority concedes that "[i]t is arguable that the defendant's credibility . . . was absolutely critical to his defense, and to the extent that the Gumby matter impacted upon his credibility, the line of questioning

did strike at the 'jugular' of his defense." This, however, understates the damage done to the defendant by the constitutional violation. Although it is true that the dropped bag incident "did not establish directly any element of the crime with which the defendant was charged," the state's version of that incident, if believed, strongly supported the case against the defendant. The state's theory of the case was that the defendant had acted as the warehouse from which the retailer, Pollard, had taken the drugs during the individual sale. That theory would have been weakened if, at the time of his arrest shortly afterward, the defendant had had no drugs in his possession. It would likewise have been greatly strengthened if the defendant could be shown to have had in his possession the twelve vials of crack cocaine that were found in the brown bag. In this context, the trial court most assuredly did strike at the "jugular" of the defendant's story when, in the middle of the defendant's testimony, it interjected a question indicating that there was something suspicious about the defendant's failure to tell the authorities about the brown bag. The Gumby issue was not only about credibility. It went to the heart of the prosecution's case.

The defendant's postarrest silence was not reemphasized by the prosecution on closing argument, but this is not essential for a harmful *Doyle* error. The majority's reliance on *Chapman* v. *United States,* supra, is inapposite, because in this case the reference to the defendant's silence was "repeated [and] linked with [the] defendant's exculpatory story," the exculpatory story was not "transparently frivolous," and evidence of guilt was not "overwhelming."[2]

---

[2] In our earlier cases considering whether a violation of *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), had occurred, we frequently quoted the following sentence from *Chapman* v. *United States,* 547 F.2d 1240, 1250 (5th Cir.), cert. denied, 431 U.S. 908, 97 S. Ct. 1705, 52

In this case, the fact of the defendant's silence was not merely elicited in passing by the prosecutor. On the contrary, both the prosecutor and the trial court directly linked the fact of the defendant's silence to his exculpatory story, and used it expressly to cast doubt upon that story.

The defendant's exculpatory story is less frivolous than the majority opinion makes it appear. The majority opinion reports that his claim was that he "had never given Pollard a glassine envelope, but had been simply shaking hands with him after making an agreement to wallpaper several rooms in Pollard's mother's house." On first blush, such a claim would appear implausible. As the state's attorney observed while

L. Ed. 2d 393 (1977): "When there is but a single reference at trial to the fact of [the] defendant's silence, the reference is neither repeated nor linked with [the] defendant's exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to [the] defendant's silence constitutes harmless error." See *State v. Shashaty,* 205 Conn. 39, 46–47, 529 A.2d 1308 (1987), cert. denied, 484 U.S. 1027, 108 S. Ct. 753, 98 L. Ed. 2d 766 (1988); *State v. Silano,* 204 Conn. 769, 782, 529 A.2d 1283 (1987); *State v. Pellegrino,* 194 Conn. 279, 292, 480 A.2d 537 (1984); *State v. Briggs,* 179 Conn. 328, 336, 426 A.2d 298 (1979); *State v. Zeko,* 177 Conn. 545, 555, 418 A.2d 917 (1979). While that quotation, taken out of context, was not misleading in those cases, it is, however, misleading in the present case. It is preceded by the following two sentences in the original, which make it clear that *Chapman* would require us to find harmful error in this case: "When the prosecution uses [the] defendant's post-arrest silence to impeach an exculpatory story offered by [the] defendant at trial and the prosecution directly links the implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous. See *United States* v. *Luna,* 539 F.2d 417 (5th Cir. 1976); *United States* v. *Harp,* [536 F.2d 601 (5th Cir. 1976)].

"When the prosecutor does not directly tie the fact of [the] defendant's silence to his exculpatory story, i.e., when the prosecutor elicits that fact on direct examination and refrains from commenting on it or adverting to it again, and the jury is never told that such silence can be used for impeachment purposes, reversible error results if the exculpatory story is not totally implausible or the indicia of guilt not overwhelming. See *United States* v. *Impson,* [531 F.2d 274, reh. denied, 535 F.2d 286 (5th Cir. 1976)]." *Chapman* v. *United States,* supra, 1249.

cross-examining Pollard, it would be "kind of odd" for Pollard to interrupt a drug transaction in order to talk to the defendant about a completely unrelated matter. Pollard explained, however, that after speaking with the defendant, he had planned to get into Gonzalez' car and ask him to drive around the block while completing the sale, and that he had hoped to persuade Gonzalez to drive him to another location. The reason for interrupting the transaction thus was that Pollard expected to be leaving the area and wanted to conclude his business with the defendant before doing so. Pollard did in fact enter Gonzalez' car after speaking with the defendant, and was in fact driven around the block. The question of whether or not this story should be believed is one for the jury, not for this court. I cannot say that it is "transparently frivolous" or "totally implausible."

Also I cannot agree with the court's assertion that "the state's evidence, although not uncontroverted, was certainly very strong." This case is already a remarkable dilution of the prior requirement for harmless error. In other cases in which we have found harmless *Doyle* error, we followed the requirement of *Chapman* by specifically holding that the indicia of guilt were "overwhelming." See *State* v. *Shashaty,* 205 Conn. 39, 51, 529 A.2d 1308 (1987), cert. denied, 484 U.S. 1027, 108 S. Ct. 753, 98 L. Ed. 2d 766 (1988); *State* v. *Silano,* supra, 784; *State* v. *Zeko,* supra, 556; see also *State* v. *Hull,* 210 Conn. 481, 493–94, 556 A.2d 154 (1989) (not citing *Chapman,* but finding evidence of guilt "overwhelming"). In this case, moreover, even the "very strong" characterization exaggerates the state's case.

The state's case rested almost entirely on the veracity and accurate perception and recollection of a single witness, Gonzalez. His testimony was contradicted by that of three witnesses: Massey, Pollard, and the defendant. Moreover, as the majority opinion acknowl-

edges, there was testimony to the effect that it was physically impossible for Gonzalez to have seen the defendant hand drugs to Pollard. The court clearly does not mean to cast doubt on the well established rule that "[t]he testimony of a police officer is entitled to no special or exclusive sanctity merely because it comes from a police officer." 5 D. Borden & L. Orland, Connecticut Criminal Jury Instructions (1986) § 3.11; see also *State* v. *Harris*, 172 Conn. 223, 228, 374 A.2d 203 (1977).

Even if we assume that Gonzalez was telling the truth, he may have been mistaken. He might well have assumed that the only reason Pollard would have for interrupting the transaction would be to obtain drugs from the defendant. The alternative explanation offered by the defendant and Pollard is plausible, but is unlikely to have occurred to Gonzalez. In the seconds that ensued, Gonzalez might well have believed he saw drugs being passed, when in fact all that was happening was that Pollard and the defendant were shaking hands. Perception is tricky, and we often see what we expected to see, and afterward hold an unshakeable conviction that that is what we saw. A jury that had not been prejudiced by unconstitutional considerations may very well have believed the defendant and his two corroborating witnesses instead of Gonzalez. "The story told by [the defendant] was plausible, and, if believed by the jury, should have led to an acquittal. Because the nature of a *Doyle* [violation] is so egregious and so inherently prejudicial, reversal is the norm rather than the exception." *Williams* v. *Zahradnick*, 632 F.2d 353, 363 (4th Cir. 1980). In this case, having to choose which set of witnesses to believe, "[t]he jury may well have sought to buttress the [state's] evidence with the testimony concerning [the defendant's] silence and whatever inferences could be drawn from it." *Rudolph* v. *Powell*, 478 F. Sup. 849, 852 (E.D. Wis. 1979). I cannot con-

clude that there is no reasonable possibility that the repeated references to the defendant's silence, by both the prosecutor and the trial court, might have contributed to the jury's verdict.

I would reverse and order a new trial. Accordingly, I respectfully dissent.