STATE OF CONNECTICUT *v.* JOHN J. CABRAL
(AC 21594)

Lavery, C. J., and Dranginis and Bishop, Js.

Argued October 15, 2002—officially released March 4, 2003

*Jeremiah Donovan*, special public defender, for the appellant (defendant).

*Michele C. Lukban*, assistant state's attorney, with whom, on the brief, were *Kevin T. Kane*, state's attorney, *Stephen M. Carney*, assistant state's attorney, and *David C. Nelson*, certified legal intern, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, John J. Cabral, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to possess one kilogram or more of marijuana with intent to sell in violation of General Statutes §§ 53a-48 and 21a-278 (b), and attempt to possess one kilogram or more of marijuana with intent to sell in violation of General Statutes §§ 53a-49 (a) (1) and 21a-278 (b). On appeal, the defendant claims that the trial court improperly (1) denied his motion to suppress his postarrest statement to the police, (2) violated his state and federal constitutional rights by permitting the state to impeach him with evidence of his postarrest silence and request for an attorney, (3) admitted into evidence, as an exception to the hearsay rule, statements made by an individual who was acting as an agent of the police and (4) allowed the state to question the defendant in regard to false statements in his application for a public defender. We reverse the judgment of the trial court and remand the case for a new trial.

The jury reasonably could have found the following facts. In 1995, the defendant met David Levarge, who lived next door to the defendant's mother-in-law. The two became friends and routinely socialized. In or about 1997, the defendant introduced Levarge to his friend, Robert Anderson, and the three men became friends.

In early October, 1998, Anderson approached the defendant to purchase some marijuana, but the defen-

dant said he had none. Anderson then told the defendant that he knew someone named "Pete" from California from whom he could buy marijuana. Subsequently, Anderson ordered three pounds of marijuana from Pete for which he and the defendant agreed to pay $3000. They also decided to have the marijuana delivered to Levarge's house because the defendant did not want the police to trace the marijuana to his house.

Sometime in mid-October, 1998, Anderson learned from the defendant and Levarge that the marijuana had not yet arrived. Anderson contacted Pete, who informed him that the marijuana had been shipped to and received at the address provided. Pete asked for telephone numbers for the defendant and Levarge.

On October 28, 1998, Levarge, who did not testify at trial, went to the state police barracks in Montville and spoke to Trooper Robert Bardelli. From there, the two men proceeded to Levarge's home. When they arrived, the telephone rang. The answering machine picked up, and a voice said that Levarge "had better show up with the package he was supposed to have."

Shortly thereafter, Levarge climbed into a crawl space in his home and retrieved three pounds of marijuana, which he handed to Bardelli. Bardelli notified his supervisor and assembled a team of officers to come to Levarge's home where they formulated a course of action. Bardelli requested that Levarge make a telephone call to Anderson. In that conversation, which was monitored and recorded by the state police, Levarge told Anderson that he now had the marijuana. He also explained that he had not been home to receive the shipment because he had taken his son to a physician and that he had told that to the defendant. He told Anderson that he would leave the package in the backseat of his son's car and that Anderson should have the defendant pick it up.

On that same day, at approximately 7:30 p.m., the police fabricated a package and placed it in Levarge's son's vehicle, which was parked at Levarge's residence. At approximately 8:45 p.m., the defendant appeared and retrieved the package from the vehicle. As the defendant began to depart, the police left their surveillance locations, announced their presence, converged on the defendant and arrested him. Bardelli testified that he read the defendant his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), at the time of his arrest.

The police then drove the defendant to a gasoline station approximately five minutes from Levarge's house. While in the police cruiser at the gasoline station, the defendant told the police that Anderson had sent him to pick up the package. When the police asked him to put his statement in writing, he declined and stated that he wanted to consult with an attorney. Subsequently, the defendant was processed at the police station where records revealed that he was read his rights pursuant to *Miranda* at 11:13 p.m. There is no written record, however, of the defendant's having been given *Miranda* warnings at the time of his arrest. Additional facts will be discussed as they pertain to the specific claims of the defendant.

I

The defendant asserts several claims regarding his rights pursuant to *Miranda*, only some of which he raised at trial. Specifically, he claims that the court should have granted his motion to suppress because (1) he was not read his rights pursuant to *Miranda* before he gave an inculpatory statement to the police, (2) the reading of his rights pursuant to *Miranda* at the time of his arrest was fatally incomplete,[1] (3) even if he

---

[1] We will not review the defendant's second claim because it is raised for the first time on appeal. "Our appellate procedures do not permit an appellant to pursue one course of action at the trial and then . . . to insist on appeal that the course which he rejected at the trial be reopened to him . . . ."

was read his rights pursuant to *Miranda*, his subsequent inculpatory statement was not knowingly and intelligently made and (4) the court improperly determined that his motion to suppress was untimely.[2]

At the outset, we set forth our standard of review for the plaintiff's remaining claims. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Clark*, 255 Conn. 268, 279, 764 A.2d 1251 (2001).

A

We first address the plaintiff's claim that he had not been given his *Miranda* warnings when he told the police that he had been picking up the package for Anderson.[3]

---

(Internal quotation marks omitted.) *State* v. *Vasquez*, 68 Conn. App. 194, 221, 792 A.2d 856 (2002). "[A]ppellate claims must be the product of trial counsel's efforts, not those of appellate counsel sifting through the record after the fact, trawling for issues undreamt of at trial." *State* v. *Safford*, 22 Conn. App. 531, 537, 578 A.2d 152, cert. denied, 216 Conn. 823, 581 A.2d 1057 (1990).

[2] We dispose of that claim by noting that the court decided the motion on the merits. The court's observation in its articulation that the motion had been untimely was, at most, gratuitous, and was in no way detrimental to the defendant.

[3] It is important to address the claim first, as "[i]t is essential to know the timing of [the defendant's statement to the police] because the use at trial of silence *prior* to the receipt of *Miranda* warnings does not violate due process." (Emphasis in original.) See *State* v. *Berube*, 256 Conn. 742, 751, 775 A.2d 966 (2001). We must first establish that *Miranda* warnings were given before we can address the defendant's claimed violation of *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), in part II.

It is settled law that a criminal defendant "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation." *Miranda* v. *Arizona*, supra, 384 U.S. 479.

Our review of the record does not support the defendant's claim that he was not read his rights under *Miranda* at the time of his arrest. At the suppression hearing, Bardelli was the only witness. He testified, without rebuttal, that he gave *Miranda* warnings to the defendant at the time of his arrest after he had placed him in the police cruiser. The court was entitled to credit that testimony in determining that, in fact, the defendant was advised of his rights pursuant to *Miranda* at the time of his arrest before any questioning took place. See *State* v. *Guckian*, 27 Conn. App. 225, 239, 605 A.2d 874 (1992) ("[i]t is the function of the court as trier of fact to assess the credibility of witnesses"), aff'd, 226 Conn. 191, 627 A.2d 407 (1993).

B

The defendant argues as well that when the police questioned him, he requested the opportunity to speak first with an attorney, but, nevertheless, the police insisted on questioning him.

The short answer to that claim is that the sequence of events implied in the defendant's motion to suppress does not comport with the court's factual findings. In sum, the court found that the defendant had been read his rights pursuant to *Miranda* upon his arrest and that shortly thereafter, he told the police that he had been sent by Anderson to retrieve the marijuana. It was only after the defendant had made that inculpatory state-

ment, when the police asked him if he was willing to put his statement in writing, that he indicated a desire to speak with an attorney and to cease talking with the police. Accordingly, the suggestion in the defendant's motion to suppress that he made the inculpatory statement after he specifically asked for an attorney and expressed his desire to stop answering questions is factually flawed. As we have often stated, we will not disturb the factual findings of a trial court unless they are clearly erroneous. *Franc* v. *Bethel Holding Co.*, 73 Conn. App. 114, 130, 807 A.2d 519, cert. granted on other grounds, 262 Conn. 923, 812 A.2d 864 (2002). The record amply supports the court's factual findings regarding the sequence of events leading to and subsequent to the defendant's inculpatory statement. We conclude, on the basis of the totality of the surrounding circumstances, that the court properly ruled that the defendant's inculpatory statement to the police was voluntary.

## II

The defendant's second claim is that pursuant to *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), the court violated his state and federal constitutional rights by improperly permitting the state to impeach him with evidence of his postarrest silence and request for an attorney. We agree. The defendant failed to raise that issue at trial and now seeks to prevail on his unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[4] We review the

[4] In *Golding*, our Supreme Court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

defendant's claim because the record is adequate for review and the claim is of constitutional magnitude. See *State* v. *Clark*, 69 Conn. App. 41, 46, 794 A.2d 541 (2002).[5]

In support of his claim of a *Doyle* violation, the defendant cites the direct testimony of three police officers, his cross-examination by the state and the prosecutor's closing argument to the jury.

On direct examination, the state asked Bardelli:

"[Prosecutor]: And [the defendant] said he was picking [the marijuana] up for another individual?

"[The Witness]: Yes. . . .

"[Prosecutor]: All right. Now, did he say anything else?

"[The Witness]: Well, we—at that point, we asked him if he wanted to give us a written statement in reference to [his statement that Anderson had sent him to pick up marijuana] and, at that point, he said he wanted a lawyer. He didn't want to say anything else. He wasn't writing any written statements."

The following day, the state questioned Officer Jeffrey Hotsky on direct examination as follows:

"[Prosecutor]: And was the defendant . . . asked to put a statement into writing?

"[The Witness]: I believe he was.

"[Prosecutor]: Okay. And did he say that, yes, he would put a statement into writing?

"[The Witness]: I don't specifically recall that, but I do recall, at some stage, he didn't—he decided he didn't want to talk to us anymore."

---

[5] We also determined in part IA that Bardelli gave *Miranda* warnings to the defendant upon his arrest.

On the same day, the state questioned Officer James Morin as follows:

"[Prosecutor]: Okay. After the defendant . . . said that he was picking up a package and that the package was marijuana, and he was bringing it to a third person, Mr. Anderson, did you ask him if he would put that in to writing?

"[The Witness]: Yes.

"[Prosecutor]: And is it at that time that he asked for an attorney?

"[The Witness]: Yes. At that time, he didn't—he felt that was enough, and he didn't want to go any further. He wanted an attorney."

On cross-examination, the state asked the defendant:

"[Prosecutor]: Okay. And right after or right before that—well, before that, the police officer said to you, 'Would you like to make a statement and put it into writing?' Do you agree with that?

"[Defendant]: Yes. Yes.

"[Prosecutor]: Okay. And you decided not to do that?

"[Defendant]: Yes.

"[Prosecutor]: Okay. And you didn't think it would be a good idea, then, to have it in writing, what had happened to you that night?"

During closing argument, the state told the jury in relevant part:

"[W]hat the three police officers who were present all agree is that, both, in the car and then again at the gas station, what [the defendant] did was—said, 'Yeah, I was picking up marijuana. I was picking up the marijuana to bring it to Anderson.' He confessed. When he was asked to give a written statement he said, 'No. I

don't want to do that. I prefer to talk with a lawyer first.' "

Under *Doyle*, "evidence of a defendant's postarrest and post-*Miranda* silence is constitutionally impermissible under the due process clause of the fourteenth amendment. . . . A *Doyle* violation also encompasses a prosecutor's comment upon a defendant's statement requesting an attorney. . . . With respect to post-*Miranda* warning . . . silence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted. . . .

"*Doyle* violations are, however, subject to harmless error analysis. . . . The harmless error doctrine is rooted in the fundamental purpose of the criminal justice system, namely, to convict the guilty and acquit the innocent. . . . Therefore, whether an error is harmful depends on its impact on the trier of fact and the result of the case. . . .

"[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. . . . The state bears the burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt. . . . That determination must be made in light of the entire record. . . .

"A *Doyle* violation may, in a particular case, be so insignificant that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible question or comment upon a defendant's silence following a *Miranda* warning. Under such circumstances, the state's use of a defendant's postarrest silence does not constitute reversible error." (Citations omitted; internal quotation marks omitted.) *State* v. *Daugaard*, 231 Conn. 195, 210–12,

647 A.2d 342 (1994), cert. denied, 513 U.S. 1099, 115 S.
Ct. 770, 130 L. Ed. 2d 666 (1995).

In the present case, the state argues that the refer-
ences at trial to the defendant's postarrest silence were
similar to those made in *Daugaard* and *State* v. *Canty*,
223 Conn. 703, 613 A.2d 1287 (1992). More precisely,
the state argues that the references were made as part
of a narrative and were not made in the context of
juxtaposing his postarrest silence to his guilt. Hence, the
state claims that the statements were harmless beyond a
reasonable doubt.

The state's reliance on *Daugaard* and *Canty* is mis-
placed. Unlike the situations in either *Daugaard* or
*Canty*, in this case, there was not merely a single refer-
ence to the fact of the defendant's silence and it did
not occur solely in the police officer's recitations. In
addition to the state's questioning of the three law
enforcement officers, Bardelli, Hotsky and Morin, who
were present at the time of the alleged confession, about
the defendant's silence, the state confronted the defen-
dant himself about his invocation of his right to remain
silent and to be represented by an attorney. Addition-
ally, the state reemphasized the defendant's silence in
its closing argument. Last, during cross-examination,
the state suggested a connection between the defen-
dant's silence and his guilt by telling him that "you
didn't think it would be a good idea, then, to have it in
writing, what happened to you that night?"

Given a record replete with references to the defen-
dant's post-*Miranda* silence and request for counsel,
we cannot conclude that the jury would have returned
a guilty verdict without the impermissible questions or
comment on the defendant's silence and request for
counsel. Therefore, we cannot conclude that the state
met its burden of proving that the error was harmless
beyond a reasonable doubt. Consequently, the defen-

dant is entitled to a new trial on both counts of the information.

## III

The defendant's third claim is that the court improperly admitted hearsay statements that Levarge made while acting as an agent of the police in a telephone conversation with Anderson. Specifically, on the basis of the holding of *State* v. *Grullon*, 212 Conn. 195, 562 A.2d 481 (1989), the defendant claims that it was legally impossible for him to be convicted of conspiracy to possess one kilogram of marijuana because a significant portion of the evidence used by the state in furtherance of that charge consisted of statements by Levarge, who, by definition, could not have been a coconspirator. We agree that the evidence should not have been admitted.

It is well settled that "a co-conspirator's [hearsay] statement, made while the conspiracy is ongoing and in furtherance of the conspiracy, is an exception to the hearsay rule and as such, does not violate the confrontation clause." (Internal quotation marks omitted.) *State* v. *Couture*, 218 Conn. 309, 322, 589 A.2d 343 (1991); see also *State* v. *Jones*, 60 Conn. App. 866, 878, 761 A.2d 789 (2000), cert. denied, 255 Conn. 942, 769 A.2d 59 (2001); Conn. Code Evid. § 8-3 (1) (D). Moreover, a "conspiracy requires a showing that two or more coconspirators intended to engage in or cause conduct that constitutes a crime." *State* v. *Grullon*, supra, 212 Conn. 199. Our Supreme Court has held that a police informant, who by definition lacks any criminal intent to participate in the conspiracy, is not a coconspirator. Id., 203. Thus, statements from a police informant cannot be admitted as an exception to the hearsay rule.

In the present case, the charge of conspiracy was premised on the defendant's criminal participation with Anderson. In support of the charge, the state introduced a tape recording of a telephone conversation between

Anderson and Levarge. The difficulty lies in the fact that by the time of the conversation, Levarge had become a police agent and that his statements in the conversation were admitted, as were those by Anderson. See id.

Although statements made by Anderson in the conversation could be viewed as inculpating the defendant in a conspiracy, the conversation impermissibly included statements made by Levarge, which were damaging to the defendant. Consequently, those portions of the tape-recorded conversation that included Levarge's statements should have been excluded as hearsay and should not have been admitted as a statement of a coconspirator.

That conclusion does not, however, end our analysis. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." *State* v. *Marshall*, 246 Conn. 799, 812, 717 A.2d 1224 (1998). "One factor to be considered in determining whether an improper ruling on evidence is a harmless error is whether the testimony was cumulative . . . ." (Internal quotation marks omitted.) *State* v. *Vega*, 48 Conn. App. 178, 192, 709 A.2d 28 (1998).

We conclude that the defendant has met that burden. During the tape-recorded conversation between Levarge and Anderson, Levarge provided the police with information implicating the defendant in the conspiracy. Specifically, he told Anderson that he was not home to retrieve the marijuana because, as he had told the defendant, he had taken his son to a physician. He further provided the background for the conspiracy, including threats by Pete for Levarge's failure to deliver the marijuana in a timely manner. In its closing argument, the state emphasized the importance of the tape in establishing that the defendant was well aware of the conspiracy and that his defense that he believed he

was picking up chips and salsa rather than marijuana was not believable. Hence, the improperly admitted evidence was so harmful that it either affected the result of the trial or undermined confidence in the fairness of the verdict.

IV

We address the defendant's last claim because the issue is likely to arise in the new trial. Specifically, the defendant claims that it was error for the state to question him in regard to false statements made in his application for a public defender. We disagree.

The following facts are relevant to the defendant's claim. At trial, the defendant testified. On cross-examination, the state asked the defendant whether he had failed to report "under the table income" when he applied for a public defender. The court overruled defense counsel's objection that such information was privileged.

Our standard of review of a court's evidentiary rulings is one of abuse of discretion. See *State* v. *Sanchez*, 69 Conn. App. 576, 583, 795 A.2d 597 (2002). We will disturb the court's evidentiary rulings only on a showing that the ruling resulted in "substantial prejudice or injustice to the defendant." (Internal quotation marks omitted.) Id., quoting *State* v. *Jackson*, 257 Conn. 198, 213, 777 A.2d 591 (2001).

In this case, the court permitted the state to cross-examine the defendant as to his false statements in his application for a public defender. More precisely, it appears from the record that the defendant failed to report "under the table" income to the office of the public defender, an omission arguably directed to his credibility as a witness as well as to his motivation to trade in an unlawful substance.

The defendant argues that the state's inquiry into his false statements in his application for a public defender creates a tension between the constitutional rights against self-incrimination and to counsel. In support of his position, the defendant has cited no decisional or statutory law, nor are we aware of any, that supports his contention that the constitutional right to counsel permits a defendant to make false representations in his application for a public defender while precluding the state from inquiring into them on the basis of the attorney-client privilege.

In permitting the examination, the court did not abuse its discretion. Although its ruling may have been harmful to the defendant in the eyes of the fact finders, it was neither improper nor unjust. We accordingly find no abuse of discretion.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.