STATE OF CONNECTICUT *v.* MIGUEL SANCHEZ
(AC 22340)

Lavery, C. J., and Mihalakos and McDonald, Js.

Argued January 9—officially released May 7, 2002

*Kirstin B. Coffin,* for the appellant (defendant).

*Lisa A. Riggione,* senior assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Vicki Melchiorre,* senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, C. J. The defendant, Miguel Sanchez, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a and carrying a pistol without a permit in viola-

tion of General Statutes § 29-35. On appeal, the defendant claims that the trial court improperly (1) denied his motion to suppress a witness' out-of-court identification that was made from a photographic array, (2) made several evidentiary rulings that either allowed the state to introduce damaging evidence or limited his ability to present a defense and (3) denied his motion for a judgment of acquittal as to the murder conviction. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of July 9, 1995, the defendant was on the front stoop of 57 Center Street in Hartford, where he lived in an apartment with his grandparents. The victim, Jose Gonzalez, who was on a bicycle, began arguing with him. The victim threw a bottle through the front door of the building, shattering the glass portion of the door. The defendant ran into the vestibule and loaded a .22 caliber gun. He came out of the building and fired three shots at the victim. One bullet entered the back of the victim's skull, killing him instantly.

The police arrived at the scene and spoke to members of the crowd that had formed around the victim. On the basis of the police interviews, the defendant quickly emerged as the only suspect. He was not apprehended until June 11, 1997, when he was located and arrested in a criminal court in Manhattan, where he was using an alias.

The defendant was tried before a jury on the charges of murder and carrying a pistol without a permit. He was found guilty of both charges and is serving a total effective term of sixty years on those charges and on a sentence enhancement on the murder charge in accordance with General Statutes § 53-202k. This appeal followed. Additional facts and procedural history will be provided as necessary.

## I

The defendant claims that the court improperly denied his motion to suppress a witness' testimony that identified him from a photographic array. He argues that the court improperly found that the identification procedure was not unnecessarily suggestive and claims that it was unreliable under the totality of the circumstances. We disagree because we conclude that the defendant did not show that the identification procedure was unnecessarily suggestive.

The court reasonably could have found the following facts during the hearing on the motion to suppress. Shortly before the shooting, Juan Estronza was riding north on Center Street in a car driven by Harry Perez. He saw the victim, with whom he was "real tight," and heard him shouting, "f--- that King, look at that King over there." Estronza asked Perez to turn around, and Perez obliged, parking slightly in front of 57 Center Street. Estronza saw that the victim was arguing with the defendant and saw the defendant enter the building. Shortly after, he heard the smash of glass breaking. Estronza saw the defendant in the vestibule, where it looked as if he were loading a gun. Estronza testified that when he saw the defendant emerge from the apartment building pointing the gun, he told Perez to "peel off." Perez obliged and Estronza heard gunshots as they drove away.

Later that night, Estronza was brought to the Hartford police station and questioned by Detective Peter Goetz about what he had seen. During an undetermined period of questioning, Estronza claimed that because he was not wearing his glasses and because of the distance between him and the individual with the gun, he could not identify that individual. Goetz left the room and Detective Jack Leitao entered with a photographic array. Leitao showed it to Estronza and asked him

whether the victim would have cooperated with the police if Estronza had been shot. Estronza then selected the defendant's photograph.

During the trial, the defendant sought to suppress any identification testimony from Estronza on the grounds that the identification procedure was unnecessarily suggestive and the resulting identification was unreliable. The court found that the identification procedure was not unnecessarily suggestive and denied the motion to suppress in a brief oral decision.[1]

"Because the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable." (Internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 553, 747 A.2d 487 (2000).

"In determining whether identification procedures violate a defendant's due process rights, [t]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . The defendant bears the burden of proving both that the identification procedures were unnecessarily sugges-

---

[1] The court stated: "Contrary to [what has] been suggested, I find that there's absolutely no undue suggestiveness. When I was first given this photo array, I had to look at [the defendant] on a number of occasions and then look back, actually, to find [the defendant]. You know, I have never seen this before. I find—denied. I'm not going to go into it any further. Let's move forward."

tive and that the resulting identification was unreliable. . . . Generally, [t]he exclusion of evidence from the jury is . . . a drastic sanction, one that is limited to identification testimony which is manifestly suspect." (Internal quotation marks omitted.) Id.; see also *State* v. *Reid*, 254 Conn. 540, 554–56, 757 A.2d 482 (2000).

In claiming that the identification procedure was unnecessarily suggestive, the defendant directs us to certain testimony at the suppression hearing from Estronza and Goetz. He notes that Estronza testified that he had told Goetz at first that he could not identify the individual with the gun because of the distance he was from the event and because he was not wearing his glasses, but that Goetz would not allow him to leave. The defendant also notes that Goetz testified that he continued to question Estronza and would have "ke[pt] asking him until I [had] hit [a] dead end. I don't think that I ever hit a dead end . . . ." The defendant concludes in his reply brief that Goetz implied "that he would question *any* witness until that witness made *some* identification" (emphasis in original) and that Estronza was coerced into choosing the defendant's photograph from the array.

For us to reach the conclusion that the defendant asks us to reach, we would have to ignore much of the rest of the record. Estronza testified that although he told Goetz that he could not identify the individual with the gun, he said that was not because of an inability to identify the defendant, whom he had known since elementary school, but "[b]ecause I didn't want to get involved at all." He also testified that Goetz "wasn't pressuring me to speak at all, he was just speaking to me." Similarly, Estronza further testified that when Leitao showed him the array, he did not suggest which photograph to select, but that Estronza identified the defendant as the shooter after Leitao asked if the victim

would have been cooperative if Estronza had been the one who was shot.

Not only do we conclude that the police action was not unnecessarily suggestive, the array itself also was within constitutional bounds. The array included eight photographs of individuals, which has long been held to be "a nonsuggestive and constitutionally acceptable practice, in the absence of any unfairness or other impropriety in the conduct of the exhibit." (Internal quotation marks omitted.) *State* v. *Fullwood*, 193 Conn. 238, 244, 476 A.2d 550 (1984). All photographs were of men with facial hair and skin coloring similar to that of the defendant. See *State* v. *Hafner*, 168 Conn. 230, 239, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975). Although the defendant alleged at trial that he appeared to be closer to the camera in his photograph than did six of the eight individuals in the array, the four individuals in the top row all were closer to the camera than were the four in the bottom row, which leads us to conclude that the array was not unnecessarily suggestive. See *State* v. *Taylor*, 239 Conn. 481, 499, 687 A.2d 489 (1996) (identification not unnecessarily suggestive where defendant's photograph one of two that was glossier, brighter than others in array), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997); *State* v. *Plaza*, 23 Conn. App. 543, 546–47, 583 A.2d 925 (1990) (identification not unnecessarily suggestive where defendant's photograph larger than all others in array and against different background), cert. denied, 217 Conn. 811, 587 A.2d 153 (1991); cf. *State* v. *Evans*, 200 Conn. 350, 355–56, 511 A.2d 1006 (1986) (identification unnecessarily suggestive where array of black and white photographs preceded single color photograph of defendant). Even if the detectives had implied that the defendant would be in the array, that factor does not on its own make it unnecessarily suggestive. See *State* v. *Reid*, supra, 254 Conn. 556;

*State* v. *Salmon*, 66 Conn. App. 131, 138, 783 A.2d 1193 (2001), cert. denied, 259 Conn. 908, 789 A.2d 997 (2002).

Taking into account the police questioning, the array and the witness' familiarity with the defendant, we agree with the court that there was not a very substantial likelihood of irreparable misidentification because of unnecessary suggestiveness. Accordingly, we need not address the defendant's claim that the photographic identification was inherently unreliable. See, e.g., *State* v. *Milner*, 206 Conn. 512, 537, 539 A.2d 80 (1988).

## II

The defendant next claims that the court made several improper evidentiary rulings that either allowed into evidence damaging information or prohibited him from presenting a defense. We disagree.

"[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 326, 746 A.2d 761 (2000). If we conclude that the court abused its discretion, we will reverse the judgment only if the court's ruling resulted in "substantial prejudice or injustice to the defendant." (Internal quotation marks omitted.) *State* v. *Jackson*, 257 Conn. 198, 213, 777 A.2d 591 (2001). With that standard in mind, we turn to the merits of the defendant's claim.

## A

The defendant claims that the court improperly admitted a portion of Estronza's testimony from which the jury could have concluded that he was a member

of the Latin Kings gang. It is the defendant's contention that the evidence was irrelevant.

Relevant evidence is evidence "having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1. "[E]vidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . [T]he fact that evidence is susceptible of different explanations or would support various inferences does not affect its admissibility, although it obviously bears upon its weight. So long as the evidence may reasonably be construed in such a manner that it would be relevant, it is admissible." (Internal quotation marks omitted.) *State* v. *Copas*, supra, 252 Conn. 326–27. Conversely, "evidence that is not relevant is inadmissible." Conn. Code Evid. § 4-2.

Estronza testified at trial that immediately before the shooting, he saw the victim and heard him shouting, "f--- that King, look at that King over there." The assistant state's attorney asked, "What's a King?" and, after Estronza answered a foundational question demonstrating his knowledge that a King was "a gang," the defendant objected on the ground that the testimony was irrelevant. The court overruled his objection, and Estronza testified that the full name of the gang was the Latin Kings. The court sustained the defendant's objection on the question of whether Estronza knew whether the defendant was a member of the Latin Kings.

The victim's statement of disdain for "the King" was relevant because it identified the defendant. Perez, who was in the car with Estronza and who also heard the victim, testified that there was another male on the front steps of 57 Center Street immediately before the shooting, but that he believed that the victim was shout-

ing at the defendant because "I know [the defendant] is a King." Perez heard glass being broken in the building and saw the defendant begin shooting. Consequently, the meaning of the term "King" was relevant to explain the identification of the person whom the victim was insulting and with whom the victim was arguing before being shot.

Moreover, even if the testimony was irrelevant, its admission did not substantially prejudice the defendant. Despite his bare assertion to the contrary, the defendant cannot show that he was harmed in light of the overwhelming evidence of his guilt, which we discuss in part III.

### B

The defendant also claims that the court, in violation of his rights under the confrontation clause of the sixth amendment to the constitution of the United States, improperly granted the state's oral motion in limine to preclude him from cross-examining Estronza about a June 2, 1999 felony arrest that subsequently was nolled. He argues that Estronza may have expected that he should provide damaging testimony at trial in exchange for the nolle and that cross-examination on the charge was constitutionally required. We disagree.

Upon learning that the defendant had an interest in cross-examining Estronza on the nolled charge, the assistant state's attorney made an oral motion in limine to preclude the defendant from doing so. She stated that Estronza's arrest had occurred in a different geographical area within our judicial system and strenuously noted that she "had nothing to do with nollying [the charge] or resolving that in any way, shape or form for Mr. Estronza. . . . I had no knowledge of that, I took no part in the disposition [and] no incentive was offered to this witness in exchange for his testimony today . . . ." Further, because the charge was not

pending, she argued that the defendant should not be allowed to inquire into it. The court granted the motion.

"[T]he defendant is entitled to confront and cross-examine fairly and fully the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . . In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial. . . . This right is not absolute . . . but may bow to other legitimate interests in the criminal trial process." (Citations omitted; internal quotation marks omitted.) *State* v. *Provost*, 251 Conn. 252, 256–57, 741 A.2d 295 (1999), cert. denied, 531 U.S. 822, 121 S. Ct. 65, 148 L. Ed. 2d 30 (2000). If we conclude that the cross-examination satisfied the confrontation clause, we review the court's ruling under the abuse of discretion standard. See *State* v. *Asherman*, 193 Conn. 695, 718–19, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985).

The defendant's cross-examination here satisfied the constitutional standard. Estronza was cross-examined on the fact that he was "real tight" with the victim, but had no opinion about the defendant, who he had known

for years, which could have helped to establish Estronza's bias. He also was cross-examined extensively on discrepancies between his testimony and his statement to the police and prior in-court testimony. Although the defendant was not allowed to cross-examine Estronza about the nolle, he did not cross-examine him about a 1996 felony conviction for robbery in the second degree and violation of probation that was elicited on direct examination. In light of the defendant's ability to otherwise cross-examine the witness as to bias, the court did not unconstitutionally restrict the defendant's cross-examination when it did not allow him to ask about the unrelated nolled charge.

The court also did not abuse its discretion in not permitting the testimony because the nolled charge was not pending at the time of trial. A party is allowed to cross-examine a witness about his pending charges or probationary status at the time that he gives a statement to the police or during the trial to establish potential bias. See *State* v. *Francis*, 228 Conn. 118, 124, 635 A.2d 762 (1993); *State* v. *Shipman*, 195 Conn. 160, 163–64, 486 A.2d 1130 (1985). Theoretically, the state could have brought the same charges against Estronza indefinitely; see *State* v. *Herring*, 209 Conn. 52, 57–58, 547 A.2d 6 (1988); although his exposure probably was limited to thirteen months after the nolle. See General Statutes § 54-142a (c). Accordingly, an argument could have been made that the state could have reinstituted the charge against Estronza if he did not provide damaging testimony against the defendant and that cross-examination on the subject was relevant to show potential bias.

Although the court could have allowed the questioning, it was a matter within its discretion. We previously have noted that a court does not abuse its discretion in restricting cross-examination about nolles where the defendant otherwise is able to cross-examine

to demonstrate bias, motive or prejudice. See *State* v. *Diorio*, 12 Conn. App. 74, 76–77, 529 A.2d 1320, cert. denied, 205 Conn. 813, 532 A.2d 587 (1987), cert. denied, 484 U.S. 1065, 108 S. Ct. 1025, 98 L. Ed. 2d 990 (1988); *State* v. *Harris*, 10 Conn. App. 217, 235–36, 522 A.2d 323 (1987); cf. *In re Marcel L.*, 14 Conn. App. 548, 549–50, 542 A.2d 340 (1988) (trial court abused discretion in restricting cross-examination · about nolled charges of the "only three witnesses whose testimony was proffered against the defendant" and nolled charges arose from same incident giving rise to charge against defendant).

Furthermore, even though our Supreme Court has stated that a defendant must be afforded the opportunity to cross-examine a witness concerning the witness' relationship to the prosecuting authorities in a criminal case; see *State* v. *Santiago*, 224 Conn. 325, 332, 618 A.2d 32 (1992); the defendant here did not produce any evidence or make an offer of proof to support his theory of potential bias. See *State* v. *Gould*, 241 Conn. 1, 17–18, 695 A.2d 1022 (1997). Accordingly, we conclude that the court did not impermissibly restrict the defendant's cross-examination.

C

The defendant also claims that the court abused its discretion in limiting the testimony of his grandmother, Maria Conlon, whom he alleges would have provided an independent explanation for his flight from 57 Center Street, thus obviating the need for the jury instruction given by the court that flight, "if unexplained . . . tends to prove a consciousness of guilt." He does not challenge the court's instruction as a matter of law, but rather the court's decision to limit Conlon's testimony. That claim may be disposed with little difficulty because the defendant has not shown that the court abused its

discretion, and the substance of the desired testimony was brought out on cross-examination.

At the beginning of its presentation, the defense indicated that it would call Conlon as its first witness. The state said that it would object to, as irrelevant, any testimony that Conlon and her husband had moved to New Britain the day after the shooting. Countering that such testimony would be relevant, the defense counsel explained that the defendant lived with Conlon and his grandfather in their 57 Center Street apartment at the time of the shooting and that the next day, the family was threatened. As a result, the grandparents moved to New Britain under police protection. The defendant claimed that Conlon's testimony about the move would be relevant to show that he may not have known that the police were looking for him because his grandparents no longer were living at the apartment.[2] Consequently, his absence from 57 Center Street would not have been unexplained. The court did not make a ruling at that time.

During Conlon's testimony, the court sustained the state's objection to the question asking Conlon when she moved from 57 Center Street, but she testified without objection that she never returned to that street following the day after the shooting. The defendant did not ask Conlon why she moved. On cross-examination, she testified that she moved to New Britain under police protection because her daughters—who helped her to move—were afraid. Both sides referenced the move during their closing arguments to the jury.

On appeal, the defendant claims that the court abused its discretion in denying him the opportunity to explain his flight through Conlon's testimony. It is difficult for

---

[2] Detective Luisa St. Pierre testified that she and other detectives returned to the 57 Center Street apartment after the night of the shooting to locate the defendant, but were unsuccessful.

us to determine the substance of that claim because it appears to us that Conlon testified on direct and on cross-examination in the way that the defendant desired. Indeed, the defendant provided an alternative reason in his closing argument to explain why he had fled to New York.[3] As such, we are unable to conclude that the court abused its discretion in restricting the testimony.

## D

The defendant also challenges the court's decision to allow the introduction of two color autopsy photographs of the victim's face.[4] The first photograph was from a center-right angle; the second showed the left side. Both photographs reveal a gash on the victim's forehead, and what appear to be scrapes beginning on the victim's nose and extending to a portion of the left side of the face. The defendant attempted in a motion

[3] The defendant argued: "You had evidence, and I'm sure the state's attorney is going to put it before you and I'm sure the state's attorney is going to tell you again and again in rebuttal that you have evidence before you that [the defendant] was arrested in New York. And he was. And remember what Detective [James] Rovella said. People leave the scene of a shooting for all kinds of reasons—scared, trying to get help—who knows? At least for all kinds of reasons. And you also know because Maria Conlon testified that the family had to move the following day. And Detective [Luisa] St. Pierre verified that. And it's funny, because originally Detective St. Pierre said oh, no, I went back to look for [the defendant] several times. Remember she said that several times? And I asked her on cross-examination, isn't it right that the family moved the following day? What are you going back there for? And that could look to [the jury] like [the defendant] did something wrong by leaving. The family left. The family left the neighborhood."

[4] At oral argument, the defense counsel, on her own initiative, wavered between conceding and "almost conced[ing]" that the court did not abuse its discretion in allowing the admission of the first photograph because it could be probative to show the exit path of the bullet. See, e.g., *State v. Satchwell*, 244 Conn. 547, 574, 710 A.2d 1348 (1998). As we discuss, however, the associate medical examiner testified that there was no exit wound and that all of the facial injuries occurred as a result of the victim's hitting the ground after the shooting. Because the defense counsel did not unambiguously concede that the first photograph was relevant, we address the court's decision to admit both photographs.

in limine and again during the trial to exclude the photographs. Both times, the court overruled his request. The defendant again argues that the second photograph was repetitive and that both were more prejudicial than probative. He is no more successful here than he was at the trial court.

In his motion in limine, the defendant sought to exclude both photographs because the graphic nature of the injuries was more prejudicial than probative and would be cumulative of other testimony if offered for the purpose of identifying the victim. Although the parties expected at the start of the trial that there might be some conflict among the witnesses as to whether the facial injuries resulted from the victim's falling to the ground immediately after the shooting or whether the victim was dragged along the pavement by Perez's car, both sides agreed that the facial injuries were unrelated to the shooting. The assistant state's attorney argued that she was entitled to show the injuries that the victim sustained as a result of the shooting, even if the cause was unclear. During a colloquy with the court, the assistant state's attorney seemed to modify her position and stated that she believed that the gash on the head was the exit wound from the bullet.[5] The

[5] The colloquy was as follows:

"[Assistant State's Attorney]: Obviously, the state is entitled to show the victim, to show the injuries that he received as a result of [the shooting], the head wound. I don't know whether the gash on the front of his forehead is as a result of falling [or] is as a result of the car incident. But the state is certainly entitled to show that, and I think that I have picked two of the least graphic photos. I do not intend to introduce any of the other photos of the victim certainly without notifying the court ahead of time, but [the jury is] entitled to see what injuries the victim suffered.

* * *

"The Court: Which is the exit wound?
"[Assistant State's Attorney]: I believe at the top.
"The Court: Oh, this is the exit wound?
"[Assistant State's Attorney]: I believe so, Your Honor. Yes.
"The Court: Anything else?
"[Assistant State's Attorney]: Nothing.

court denied the defendant's motion in limine and stated that it did not believe that the photographs were inflammatory.

The defendant renewed his objection without additional argument during the trial when the state introduced the first photograph for identification during the testimony of one of the police officers who was at the scene. The court overruled the objection and the photograph was admitted.

The defendant again objected when the state attempted to introduce the second photograph during the testimony of the associate medical examiner, and its admissibility was discussed outside the presence of the jury. The state argued that the photograph would be offered for identification and that it "better depicted the side views of the injuries," which would illustrate the associate medical examiner's testimony as to their cause. The state also expressed its concern that the defense counsel would raise the issue of how the injuries were sustained on cross-examination and reiterated that a later witness would testify that the victim was dragged along the pavement by Perez's car. If that testimony were introduced, the state argued, then the jury could conclude that the shooting was not the cause of death. The state then would have to recall the associate medical examiner as a rebuttal witness. For his part, the defendant argued that the photograph was cumulative and again argued that it was more prejudicial than probative. After expressing concerns about the photograph's relevance, the court overruled the defendant's objection. The associate medical examiner testified that it was her opinion that the victim's death was instantaneous, and that the other facial injuries were unrelated to the shooting and "are typical injuries that [the victim]

"[Defense Counsel]: No, sir.
"The Court: Objection overruled."

fell on a hard, flat surface . . . ." The defense counsel did not challenge the associate medical examiner's opinion on that subject on cross-examination, and there was no testimony during the trial that the victim was dragged by Perez's car.

Even photographs depicting gruesome scenes that may prejudice the jury are admissible, so long as, in the court's discretion, they are more probative than prejudicial. *State* v. *Haskins*, 188 Conn. 432, 452–53, 450 A.2d 828 (1982). A court may exclude relevant evidence "if its probative value is outweighed by the danger of *unfair* prejudice . . . ." (Emphasis added.) Conn. Code Evid. § 4.3. Our Supreme Court has "outlined four situations where prejudice to the defendant could outweigh the probative value of evidence. These are: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) *State* v. *Robertson*, 254 Conn. 739, 757, 760 A.2d 82 (2000). "There is no requirement in this state that a potentially inflammatory photograph be essential to the state's case in order for it to be admissible; rather, the test for determining the admissibility of the challenged evidence is relevancy and not necessity." (Internal quotation marks omitted.) *State* v. *Doehrer*, 200 Conn. 642, 649, 513 A.2d 58 (1986).

We conclude that the court could have properly determined that the first photograph was relevant for the purpose of having the police officer who had been at the crime scene identify the victim, and the court did not abuse its discretion in admitting it. The second

photograph presents a closer case. Because the associate medical examiner testified that the victim died instantaneously, it is difficult for us in hindsight to see how the admission of a photograph showing facial injuries caused after death accompanied by testimony regarding how those unrelated injuries were sustained helped to prove any material fact. As we previously noted, there was no conflicting testimony regarding the cause of the injuries or that the death was instantaneous.

If our standard of review were broader, we may very well conclude that the graphic nature of the second photograph was more prejudicial than its limited probative value supporting instantaneous death. Our standard of review is not broad, but rather is limited to whether the court clearly abused its discretion. The fact that we may be able to conclude that a photograph was not relevant "does not mean that other reasonable persons might . . . conclude otherwise." Id., 650–51 n.1. Additionally, at the time that the photograph's admissibility was challenged, both attorneys believed that there would be conflicting testimony as to how the injuries were sustained. If there had been evidence that the victim was dragged along the pavement by Perez's car, the photograph and medical examiner's testimony refuting that testimony could have been relevant on the issue of whether the gunshot caused the victim's death. Accordingly, the court did not abuse its discretion in allowing its admission because it appeared to be relevant at the time it was offered. See *State* v. *Booth*, 250 Conn. 611, 620, 737 A.2d 404 (1999) (trial court discretion whether to sever trial " 'necessarily exercised before the trial begins and with reference to the situation as it then appears to the court' "), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000). The proper course of action for the defendant would have been to move to

strike the photograph and that portion of the associate medical examiner's testimony at the conclusion of the case once it was determined that the evidence was irrelevant. He, however, did not make such a motion. Accordingly, we will not correct an action of the court that was not improper.

### III

The defendant finally claims that the court improperly denied his motion for a judgment of acquittal as to the murder conviction. He claims that the police focused on him as a defendant without a thorough neighborhood canvass, that the eyewitnesses testifying for the state were not credible and that there was no physical evidence linking him to the crime. We disagree.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Gibbs*, 254 Conn. 578, 606–607, 758 A.2d 327 (2000).

The defendant's claim that the court should have granted his motion for a judgment of acquittal on the murder charge is threefold: (1) that the police focused on him rather than conducting a neighborhood canvass to determine whether the shooter may have been another individual; (2) the state's witnesses did not actually witness the shooting and were otherwise unre-

liable; and (3) there was no physical evidence linking the defendant to the crime. As the state points out, the defendant is not challenging that the shooting met the elements of murder,[6] but the jury's finding that he was the shooter. None of the defendant's proffered reasons persuade us that the court's denial of the motion for a judgment of acquittal was improper.

"[T]he question of identity of a perpetrator of a crime is a question of fact that is within the sole province of the jury to resolve." *State* v. *Jackson*, supra, 257 Conn. 206. "Identification may be shown by circumstantial as well as by direct evidence . . . Moreover, [i]n considering the evidence introduced in a case, [j]uries are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life, but, on the contrary, to apply them to the facts in hand, to the end that their action may be intelligent and their conclusions correct." (Citation omitted; internal quotation marks omitted.) *State* v. *Vasquez*, 53 Conn. App. 661, 665, 733 A.2d 856, cert. denied, 250 Conn. 922, 738 A.2d 662 (1999).

Here, the jury could have reasonably found from the circumstantial evidence of the state's three eyewitnesses that the defendant shot the victim. Estronza testified that he saw the defendant enter the vestibule, where it looked as if he was loading a gun. He also testified that he saw the defendant emerge from the building with the gun and heard gunshots. Perez testified that he saw the defendant come out of the building with a gun and start shooting. Vachon Wallace testified that although he did not see the defendant's gun, he

---

[6] Indeed, the defense counsel began his closing argument to the jury by stating: "This is the photograph of the young man who was killed on July 9, 1995. Take a good look at it. Because there was proven beyond a reasonable doubt at this trial, and unfortunately that was a fact that was never in dispute, that this young man . . . was shot to death on Center Street."

saw the defendant come out of the building shooting. He also testified that he saw the victim get hit and fall to the ground. Estronza and Wallace had known the defendant for several years, and Perez knew his name and had seen him before.

As the court correctly charged the jury, circumstantial evidence may be just as probative as direct evidence. See, e.g., *State* v. *Sauris*, 227 Conn. 389, 399, 631 A.2d 238 (1993). Furthermore, "[i]t is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) Id. Because the jury reasonably could have found that the defendant was the shooter, the court properly denied the defendant's motion for a judgment of acquittal as to the murder conviction.

The judgment is affirmed.

In this opinion the other judges concurred.