STATE OF CONNECTICUT *v.* VINCENT FERRAIUOLO
(AC 23973)

Lavery, C. J., and McLachlan and Peters, Js.

Argued October 20—officially released December 16, 2003

*Lisa J. Steele*, special public defender, for the appellant (defendant).

*Julia K. Conlin*, deputy assistant state's attorney, with whom, on the brief, were *Mary M. Galvin*, state's attorney, and *Paul O. Gaetano*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, C. J. The defendant, Vincent Ferraiuolo, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation General Statutes § 53a-54a.[1] On appeal, the defendant claims that the trial court improperly admitted into evidence (1) needlessly

[1] General Statutes § 53a-54a provides in relevant part that "[a] person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

cumulative autopsy slides, and (2) a *Miranda*[2] waiver form and written statement that he had signed. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts.[3] On April 26, 1999, Chong Hong was employed as a front desk clerk at the West Haven Hotel (hotel) at 7 Kimberly Avenue in West Haven. After Hong ate dinner in the hotel kitchen with the victim, Josephine Lee, and another employee, he went to his room to rest before the start of his shift. At some time before 9 p.m., he heard a banging on his door and ran out to investigate. Hong went to the front desk and saw that it was unattended. Hong called the police and then was informed of an incident that had occurred upstairs in the room of the victim.

The door to the victim's room was open, and Hong entered. He observed the victim lying on the floor, bleeding extensively from wounds on her face and head. Hong asked the victim what had happened, and she replied, "It's Vinny." Hong observed a great deal of blood in the room, and heard the victim "moaning and groaning" as they waited for the police and medical personnel to arrive. An ambulance arrived, and the victim was taken to a hospital. The victim subsequently died as a result of her injuries.[4]

---

[2] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] The defendant elected to waive counsel and proceeded pro se at his trial. Jury selection began on May 24, 2000, and the state began to present evidence on June 15, 2000. The jury could not reach a verdict. The court, *Grogins, J.*, issued three "Chip Smith" charges; see *State* v. *Smith*, 49 Conn. 376 (1881); but subsequently declared a mistrial on August 7, 2000. Voir dire for the second trial commenced on October 17, 2001. Evidence was presented to the jury before *Holden, J.*, and the second jury starting on October 29, 2001. The second jury found the defendant guilty of murder.

[4] Seth Spector, a surgeon who treated the victim, testified that the victim died as a result of massive blood loss from multiple wounds. Edward T. McDonough, the state's deputy chief medical examiner, testified that the cause of death was blunt force trauma to the head.

William Bruneau, a patrol officer with the West Haven police department, had received a report of a robbery at the hotel. Bruneau did not go to the hotel, but instead was dispatched as a perimeter officer. Bruneau received a description that the suspect was a white male wearing a green shirt. Bruneau observed the defendant, a white male wearing a green shirt, attempting to enter the backseat of a taxicab. After blocking the taxicab with his police vehicle, Bruneau approached the defendant while removing his weapon from its holster. The defendant immediately threw his hands in the air and said, "I'm the guy you're looking for. Don't shoot. Don't hurt me. I won't resist." Bruneau handcuffed the defendant and noticed that the defendant's hands were covered in blood, and that it appeared that the defendant had wiped blood onto his chin and down the front of his shirt. The defendant was placed in the backseat of the police vehicle, and kept repeating that he would not resist and that he was "the guy you're looking for."

Bruneau learned that the defendant might have been carrying a knife, so he took the defendant out of the vehicle to determine if, in fact, the defendant was in possession of a weapon. At that time, the defendant stated: "My name is Vinny. Vinny Ferraiuolo. I don't have a knife, I beat her with my hands." The defendant repeated that statement while Bruneau patted him down. No weapon was found, and the defendant was placed back in the police vehicle. The defendant continued to talk in the backseat, stating that "you [Bruneau] got to understand. You'd do the same thing I did." The defendant stated that he had lent $60,000 to the victim and that she had stolen that money. Bruneau instructed the defendant to be quiet and transported him to the police station.

James Sweetman, a detective with the West Haven police department, asked the defendant if he wanted to discuss the incident, and the defendant stated that

he did not. A short time later, the defendant indicated that he wanted to give a statement regarding the victim. Sweetman advised the defendant of his *Miranda* rights, and the defendant initialed and then signed a waiver form indicating that he was waiving those rights. Sweetman then asked the defendant about the homicide at the hotel, and the defendant verbalized the entire incident. The defendant stated that he repeatedly had struck the victim in the head with a golf club and a metal roller. Golf clubs and the metal roller were recovered from the victim's room and were covered in the victim's blood. Sweetman then set up a computer terminal and asked the defendant to repeat his statement so that it could be typed. Sweetman allowed the defendant to read the typed statement and asked the defendant if he wanted to make any changes. The defendant declined to make any changes. The statement was printed, and the defendant reviewed it again and then signed it.[5]

---

[5] The two page statement was read to the jury and stated in relevant part: "I, [the defendant], age 39, make the following voluntary statement of my own free will, without threat or promise, to a member of the West Haven Police Department, knowing that it may be used in a court of law. I have been advised that I have a right to consult with a lawyer, to stand mute, and to sign nothing. These rights I hereby waive. I make this statement to Detective Sweetman . . . whom I know to be a member of the West Haven Police Department. I fully understand that if I make a statement that is untrue and which is intended to mislead a law enforcement officer in the performance of his official function, I would be violating [section] 53a-157 of the Connecticut General Statutes.

"On the first week in March and the last 2 days in Feb. me and [the victim] have been having business problems regarding money. I was [the victim's] boyfriend. The business is the [hotel] at 7 Kimberly [Ave.]. [The victim] had money problems and I have been helping her run the hotel, 18 hours a day at no charge, for approx. four months.

"[The victim] came to me about stolen jewelry for an insurance claim. She claimed that the jewelry was stolen out of the hotel. I have personal knowledge that the jewelry is in a safety deposit box in City bank or maybe Citicorp in Manhattan. The safety deposit box is under her name . . . . [The victim] insisted that if I told the police that I knew where the jewelry was, that she would blame me for taking the jewelry. She did do this at a later date after I left. [The victim] claimed that I stole checks both commercial and personal checks which she blamed me. She filed a police report on the

The jury found the defendant guilty of murder, and the court sentenced him to an effective prison term of sixty years incarceration.[6] This appeal followed. Additional facts will be set forth as necessary.

## I

The defendant first claims that the court improperly admitted into evidence needlessly cumulative autopsy slides of the victim. Specifically, the defendant argues that the court abused its discretion in admitting seventeen color slides of the victim, some of which showed the same injuries and some of which did not show any injuries to the head or face at all. The state contends that it was within the court's discretion to admit the slides into evidence. The state also argues, in the alternative, that even if the court acted improperly in admitting the slides, such error was harmless. We agree with the state with respect to both arguments.

stolen checks, which never happened. She begin in January to keep duplicate records. She was committing Income Tax evasion. [The victim] said if I did not go along with it she would blame me for it. I was also loaning [the victim] money for her legal expenses.

"I was depressed and I knew she was lying to me about everything, the finances for the hotel and the mortgage from the hotel. At this time I left the hotel and went back to New York. I started to see a Psychologist because I was depressed and felt I was used. At that point I contacted her several times in an effort to straighten the problem out. She refused, and stated that if I called she would find new charges to file against me. [The victim] said at this point she did not care what happened to me, if I lived or died. I became more and more depressed about the situation.

"I finally snapped, I could not take it anymore. I then snapped and fought back. I picked up a golf club that was on the floor of the room, which was her golf club. I struck [the victim] twice in the head. A wooden handle that was on the floor with the golf clubs, I picked up and struck her with it once or twice on the head. I do not know what the wooden handle was. I then left the room. When I was leaving I heard someone screaming to me in Korean from behind. I kicked a glove down the hallway toward the stairwell. The police then picked me up a block and half from the motel. I voluntary got into the car.

"I have read the above statement, and it is the truth to the best of my knowledge."

[6] At the defendant's sentencing hearing, the state entered a nolle prosequi to a pending charge of assault in the first degree.

## A

At the outset, we set forth the legal principles that guide our review of the issue. "This court has consistently held that photographic evidence is admissible where the photograph [or slide] has a reasonable tendency to prove or disprove a material fact in issue or shed some light upon some material inquiry. . . . [Moreover] [t]here is no requirement . . . that a potentially inflammatory photograph be essential to the state's case in order for it to be admissible; *rather, the test for determining the admissibility of the challenged evidence is relevancy and not necessity.* . . . Thus, although irrelevant evidence of a gruesome character is inadmissible, [t]he prosecution, with its burden of establishing guilt beyond a reasonable doubt, is not to be denied the right to prove every essential element of the crime by the most convincing evidence it is able to produce." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Satchwell*, 244 Conn. 547, 574–75, 710 A.2d 1348 (1998); C. Tait, Connecticut Evidence (3d Ed. 2001) § 11.17.1, p. 816; see generally annot., 37 A.L.R.5th 515 (1996).

"A potentially inflammatory photograph may be admitted if the court, in its discretion, determines that the probative value of the photograph outweighs the prejudicial effect it might have on the jury. . . . The determination of the trial court will not be disturbed unless the trial court has abused its discretion." (Citations omitted.) *State* v. *Williams*, 227 Conn. 101, 111, 629 A.2d 402 (1993); see also *State* v. *Walker*, 206 Conn. 300, 314–15, 537 A.2d 1021 (1988); *State* v. *Sanchez*, 69 Conn. App. 576, 594, 795 A.2d 597 (2002). With the foregoing legal principles and standard of review in mind, we now address the specifics of the defendant's claim.

At the defendant's first trial, the state made an offer of proof outside the presence of the jury with respect

to twenty-two color slides that had been taken at the direction of Edward T. McDonough, the state's deputy chief medical examiner. Seventeen of the slides were of the victim, and five were of objects taken from the victims' room, specifically, the golf clubs and the metal roller.

The defendant objected to the introduction into evidence of some of the slides. Specifically, he argued that they were repetitious and that there would be a prejudicial impact on the jury. The defendant also argued that the slides, in particular the pictures of the victim's head, were "gory." He did not object to some of the slides being shown to the jury. The state argued that all the slides were necessary to prove the element of intent. Furthermore, the state noted that the different angles depicted in the various slides demonstrated the details regarding all of the lacerations and wounds to the victim's head and face. The court agreed with the state and overruled the defendant's objection.

During his second trial, the defendant filed a motion in limine that sought to preclude the admission of the slides into evidence on the ground that their prejudicial effect on the jury outweighed their probative value. During argument on the motion, the defendant conceded that he did not have any additional case law to support his motion or that would change the ruling from the first trial. The court adopted the ruling from the first trial and denied the defendant's motion.

During McDonough's testimony, the defendant renewed his objection to the slides. He objected to each and every slide because they were excessive, repetitive, had no probative value and were introduced for the sole purpose of prejudicing the jury. The court overruled the defendant's objection. McDonough stated that the slides would be helpful in illustrating how he had per-

formed the autopsy and how the injuries were inflicted on the victim.

McDonough then described to the jury each of the slides. He explained that the first few slides were preliminary photographs of the victim's body as she first arrived at his office. Those slides were used primarily for identification purposes. McDonough then showed slides that depicted the various lacerations to the victim's face and head. Some of the slides showed wounds that had been sutured, and others showed the same wounds without the sutures. McDonough noted that the slides demonstrated that the wounds had been caused by an instrument with an edge, such as a golf club, as opposed to a flat surface. He also explained that the victim suffered more than ten lacerations as a result of multiple blows.

In his brief, the defendant first argues that the five slides that depicted the victim's body as it arrived at the medical examiner's office were needlessly cumulative.[7] He contends that although it may have been proper for the court to admit one of those slides, to admit all of them into evidence, particularly those slides of the lower half of the body, was improper. He further argues that the before and after slides showing the same wounds with and without sutures was improper and

---

[7] The defendant also argues in his brief that several of the jurors stated during voir dire that they would be affected by graphic images. We have reviewed the transcript of voir dire questions and are satisfied that the responses indicated that the jurors could be fair and impartial despite observing graphic images.

We also note that the defendant did not challenge for cause any member of the venire panel with respect to the possible effects of graphic images. Appellate counsel for the defendant acknowledged that no challenge was made during voir dire and that claims regarding the jury therefore were waived. The defendant represented himself in the second trial. "Although we are solicitous of the rights of pro se litigants . . . [s]uch a litigant is bound by the same rules . . . and procedure as those qualified to practice law." (Citation omitted; internal quotation marks omitted.) *Cohen* v. *Cohen*, 41 Conn. App. 163, 165 n.3, 674 A.2d 869 (1996).

that only the slides of the wounds without evidence of medical intervention should have been admitted into evidence.

At the outset, we note that our Supreme Court has stated that "photographs of a corpse have been held properly admissible in prosecutions for homicide in spite of a claim that they constitute merely cumulative evidence." *State* v. *Piskorski,* 177 Conn. 677, 701, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); see also *State* v. *DeJesus,* 194 Conn. 376, 385, 481 A.2d 1277 (1984); *State* v. *Hanna,* 150 Conn. 457, 461, 191 A.2d 124 (1963). Furthermore, we have stated that "[e]ven photographs depicting gruesome scenes that may prejudice the jury are admissible, so long as, in the court's discretion, they are more probative than prejudicial. . . . A court may exclude relevant evidence 'if its probative value is outweighed by the danger of *unfair* prejudice. . . .' Conn. Code Evid. § 4.3." (Citation omitted; emphasis in original.) *State* v. *Sanchez,* supra, 69 Conn. App. 593.

In the present case, the slides were used to help explain the autopsy procedure and assist McDonough in describing his observations. As he stated in his testimony: "No matter how good my descriptions of any injury might be, it certainly is easier or complementary to see them in photographic form." The slides also were relevant to the issues of intent and cause of death. The slides, therefore, were the most convincing evidence that the state was able to produce and assisted the state with its burden of proving every essential element of the crime of murder beyond a reasonable doubt. See *State* v. *Williams,* supra, 227 Conn. 111–12.

It is clear that the state was entitled to have the jury view some of the slides. What is less clear is whether it was proper for the court to admit into evidence all of the slides that depicted the victim's body and did

not show any of the wounds from the defendant's attack or all of the repetitive slides of the wounds with and without sutures. As we have stated, we are bound to review the defendant's claim under the abuse of discretion standard. If our standard of review were broader, we may well have reached a different conclusion, i.e., that the slides of the victim's body and wounds were so repetitive in nature that their prejudicial impact on the jury outweighed their probative value. We agree with the Supreme Court of Washington, which stated: "Prosecutors as well as trial courts must exercise their discretion in the use of gruesome photographs. The statement that the State had the right to prove its case up to the hilt in whatever manner it chose, must be read to mean only that the State may present ample evidence to prove every element of the crime. . . . Prosecutors are not given a carte blanche to introduce every piece of admissible evidence if the cumulative effect of such evidence is inflammatory and unnecessary." (Citation omitted; internal quotation marks omitted.) *State* v. *Crenshaw*, 98 Wash. 2d 789, 807, 659 P.2d 488 (1983). Nevertheless, we are constrained by our standard of review. As we stated in *Sanchez*: "The fact that we may be able to conclude that a photograph was not relevant does not mean that other reasonable persons might . . . conclude otherwise." (Internal quotation marks omitted.) *State* v. *Sanchez*, supra, 69 Conn. App. 594. In accordance with the principle that the trial court is afforded broad leeway in determining whether the probative value of the slides outweighed their prejudicial effect, even in a close case, we cannot conclude that the court abused its discretion in admitting all of the slides into evidence.

B

Even if we were to assume arguendo that the court abused its discretion in admitting into evidence all of the

slides, we would conclude that such error was harmless beyond a reasonable doubt.

We have stated that "[u]nder the current and long-standing state of the law in Connecticut, the burden to prove the harmfulness of an improper evidentiary ruling is borne by the defendant. The defendant must show that it is more probable than not that the erroneous action of the court affected the result. . . . Further-more, [t]he ruling of the trial court in order to constitute reversible error must have been both incorrect and harmful. . . . The question is whether the trial court's error was so prejudicial as to deprive the defendant of a fair trial, or, stated another way, was the court's ruling, though erroneous, likely to affect the result?" (Citation omitted; internal quotation marks omitted.) *State* v. *Lewis*, 67 Conn. App. 643, 653–54, 789 A.2d 519, cert. denied, 261 Conn. 938, 808 A.2d 1133 (2002).

In the present case, the defendant was found near the hotel soon after the attack on the victim. He was wearing clothing that matched the description of the perpetrator. When Bruneau handcuffed the defendant, he noticed that the defendant's hands were covered in blood that later was determined to belong to the victim. The defendant made an oral confession and subse-quently signed a written statement that stated he killed the victim in a manner consistent with the evidence; that is, he repeatedly struck the victim's head and face with an edged instrument. Finally, we note that the victim identified her attacker as "Vinny."

In light of the overwhelming evidence of the defen-dant's guilt, we agree with the state that even if we were to conclude that the court abused its discretion in admitting all of the slides, such error was harmless beyond a reasonable doubt.

## II

The defendant also claims that the court improperly admitted into evidence his signed *Miranda* waiver form

and written statement. Specifically, the defendant argues that the court in his second trial simply adopted the ruling from the first trial regarding the authentication of the waiver form and the two page confession, and ignored the testimony from a handwriting expert, which was not available at the first trial. We are not persuaded.

The following additional facts are necessary for the resolution of that issue. During the first trial, a hearing regarding the defendant's waiver form and the statement was held outside the presence of the jury. Sweetman testified that he had interviewed the defendant at the police station. Initially, the defendant refused to make a statement, but he soon changed his mind. Sweetman advised the defendant of his *Miranda* rights and filled out a waiver form. Sweetman stated that the defendant had read the form sentence by sentence and placed his initials after each sentence, indicating that he understood the particular right he was waiving. Sweetman testified that he observed the defendant sign the bottom of the form. The defendant objected, stating that he never initialed or signed the waiver form. The court overruled the defendant's objection and admitted the waiver form into evidence as a full exhibit.

The state next offered the statement into evidence, and the defendant objected. Sweetman testified that he took the defendant's statement regarding the events that occurred at the hotel. Sweetman asked the defendant questions and typed his responses on the basis of the defendant's narrative. The defendant was given the opportunity to make changes to the statement both before and after the statement was printed. The defendant then signed the statement in the presence of Sweetman and Walter S. Casey, a detective sergeant in the West Haven police department. Sweetman and Casey both testified that they were 100 percent certain

that the defendant had made and signed the statement. The defendant again objected on the ground that he never had read or signed the statement.

The court heard argument with respect to the admissibility of the statement. The court noted that the signature on the statement was not similar to the signature found on the motions that the defendant had filed in court. The court then ruled that the statement was admissible because any discrepancies between the signatures pertained to the weight of the evidence rather than to its admissibility.

At the second trial, the court reviewed the defendant's motion to suppress the waiver form and the statement, as well as the transcript and ruling from the first trial. The court ruled that the evidence was admissible and that the order from the first trial would not be disturbed. The court further explained that it was aware that a handwriting analysis had been performed, but did not know the results.[8] The handwriting expert, James Streeter, testified that he had examined the signature on the waiver form and the statement, and compared them to the known signature of the defendant. Streeter was unable to verify that the signature on the waiver form and statement belonged to the defendant. Streeter also stated that he could not eliminate the defendant as being the author of the signatures on the waiver form and statement.

At the outset, we set forth the applicable standard of review. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor

[8] The handwriting analysis took place between the first and second trials.

of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Moody*, 77 Conn. App. 197, 204, 822 A.2d 990, cert. denied, 264 Conn. 918, 827 A.2d 707 (2003).

"Authentication is . . . a necessary preliminary to the introduction of most writings in evidence. . . . In general, a writing may be authenticated by a number of methods, including direct testimony . . . . Both courts and commentators have noted that the showing of authenticity is not on a par with the more technical evidentiary rules that govern admissibility, such as hearsay exceptions, competency and privilege. . . . Rather, there need only be a prima facie showing of authenticity to the court. . . . Once a prima facie showing of authorship is made to the court, the evidence, as long as it is otherwise admissible, goes to the jury, which will ultimately determine its authenticity. . . . The only requirement is that there have been substantial evidence from which the jury could infer that the document was authentic." (Citations omitted; internal quotation marks omitted.) *State* v. *Berger*, 249 Conn. 218, 233, 733 A.2d 156 (1999); see also Conn. Code Evid. § 9-1; C. Tait, supra, § 9.6.1, p. 761 ("[a] writing can be authenticated merely by proof of the signature of the writer. . . . Such proof can be provided by testimony of . . . an eyewitness who saw the writing executed" [citations omitted]).

The defendant claims that the signatures on the waiver form and statement had not been properly authenticated and that it was therefore improper for the court to admit them into evidence, particularly in light of the inconclusive expert opinion. That argument, however, confuses the admissibility of the signatures with the weight to be afforded to them. In the present case, Sweetman testified that he observed the defendant initial and sign the waiver form. Furthermore, he

stated that he saw the defendant sign the statement. Additionally, Casey testified that he witnessed the defendant sign the statement and that he attached his signature to the document.

We find that such testimony was substantial prima facie evidence from which the jury could infer that the document was authentic and therefore admissible. It was for the jury, as the trier of fact, to determine how much weight to afford the waiver form, the statement and the expert opinion. We conclude, therefore, that the court did not abuse its discretion in admitting into evidence the signed waiver form and statement.

The judgment is affirmed.

In this opinion the other judges concurred.